EQUAL EMPLOYMENT OPPORTUNI-
TY COMMISSION, Plaintiff,

v.

SEARS, ROEBUCK & COMPANY,
Defendant.

No. 79 C 4373.

United States District Court,
N. D. Illinois, E. D.

Nov. 7, 1980.

Thomas P. Sullivan, U. S. Atty., Margaret L. Herbert, Chicago, Ill., James P. Scanlan, Robert B. Harwin, Robin E. Harvey, E.E. O.C., Washington, D. C., for plaintiff.

Albert E. Jenner, Jr., Jenner & Block, Chicago, Ill., Charles Morgan, Jr., Hope Eastman, Washington, D. C., for defendant.

## MEMORANDUM OPINION

GRADY, District Judge.

Plaintiff, the Equal Employment Opportunity Commission ("the Commission"), has filed this action against Sears, Roebuck and Company ("Sears") alleging sex discrimination under Section 703 of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e–2, and equal pay violations under Section 6(d) of the Fair Labor Standards Act ("Equal Pay Act of the FLSA"), 29 U.S.C. § 206(d). These violations include discriminatory practices in the recruitment, selection, assignment, transfer, training and promotion of women at Sears facilities "in each and every state of the Continental United States." In addition, it is alleged that Sears has paid female employees lower wages for work requiring equal skill, effort and responsibility at Sears establishments "throughout the United States." Extensive injunctive relief and monetary damages, in the form of back pay awards, are sought on these claims. We note that four other Title VII actions, alleging "race" and "national origin" discrimination at selected facilities, were simultaneously brought against Sears

by the Commission in different jurisdictions.[1] Two of these suits have now been dismissed, with a third suit proceeding to a trial on the merits.[2]

■ Defendant Sears has moved to dismiss this action on the basis of the Commission's failure to satisfy certain alleged statutory prerequisites to suit, abusive practices in the investigation of Sears, and res judicata as to the equal pay claims under the provisions of the FLSA. For the following reasons, we will deny defendant's motion to dismiss.[3]

*Facts and Legal Standard*

■ Before stating the factual allegations underlying defendant's motion to dismiss, it is appropriate to set out the legal standard to be applied. For purposes of this motion, inasmuch as only limited discovery has occurred, we will take the unusual step of resolving factual disputes in the defendant's favor. We have, in essence, adopted a "worst case" analysis to determine whether *any* legal basis can be stated for the dismissal of this action on issues collateral to the merits.[4] If in fact such a

---

**1.** The other suits were filed in the following jurisdictions: the Middle District of Alabama, 490 F.Supp. 1245 (race discrim., one store), the Northern District of Georgia (Civil Action No. 79–1957A) (race, two stores and one other facility), the Southern District of New York (Civil Action No. 79–CIV–5708) (race and national origin, two stores), and the Western District of Tennessee (Civil Action No. 79–2695–B) (race, one facility).

**2.** Judge Varner dismissed the Alabama Title VII suit for failure to properly verify the charge and to satisfy the statutory requirement of conciliation. *EEOC v. Sears, Roebuck and Co.*, 490 F.Supp. 1245 (M.D.Ala.1980). Judge Duffy adopted Judge Varner's reasoning in dismissing the New York discrimination suit brought by the Commission. *EEOC v. Sears, Roebuck and Co.*, 79 Civ. 5708, U.S. District Court for the Southern District of New York, Memorandum Opinion (June 13, 1980). Judge Freeman denied Sears' motion for summary judgment in the Georgia suit. He held, *inter alia*, that the Commission satisfied the verification and conciliation requirements and rejected allegations of bad faith, conflicts of interest and misconduct as a basis for relief. *EEOC v. Sears, Roebuck and Co.*, Civil Action No. 79–1957A, U.S. District Court for the Northern District of Georgia, Memorandum Opinion (March 14, 1980).

**3.** The motion is characterized as a motion to dismiss despite the fact that it goes outside the pleadings. Where jurisdictional or quasi–jurisdictional issues are intertwined, there is authority for this characterization of the motion. *See Satz v. ITT Financial Corp.*, 619 F.2d 738, 742 (8th Cir. 1980) (dist. ct. may consider matters outside pleadings in determining whether there is subject matter jurisdiction in Title VII suit); *Exchange National Bank v. Touche Ross and Co.*, 544 F.2d 1126, 1130–31 (2d Cir. 1976); *Land v. Dollar*, 330 U.S. 731, 735 and n. 4, 67 S.Ct. 1009, 1010 and n. 4, 91 L.Ed. 1209 (1947).

In this case, defendant pleads that certain statutory prerequisites to a Commission suit have not been met. Without indicating whether we believe every step in the investigative process is "jurisdictional," we will consider the particular allegations at this stage. With some strain, we also find that Sears' allegations of misconduct and conflicts of interest may raise a threshold question of whether the EEOC instituted and proceeded with its investigation in good faith. This interpretation of the allegations is admittedly debatable. It may well have been more appropriate to treat these allegations as raising affirmative defenses to be considered on a motion to strike. With the hope of considering all issues collateral to the merits at the same time, however, we have broadly viewed the motion to dismiss to see whether, at this initial juncture, there is any basis for additional discovery or even a mini–trial on defendant's contentions. *See Simpson v. Alaska State Commission for Human Rights*, 423 F.Supp. 552, 554 (D. Alaska 1976) (court determination of whether defenses asserted are invalid as a matter of law should be made "at an early stage to enable the parties to proceed with the litigation in the proper posture"); *Purex Corp., Ltd. v. General Foods Corp.*, 318 F.Supp. 322, 323 (C.D.Cal.1970) ("if there is *any* possibility "that defenses might succeed after full hearing on the merits, defendant should be given the opportunity to prove his allegations). *See* discussion of "worst case" analysis, text at p. 245, *infra*.

A final note: In deciding this motion, we have considered evidence based on completed discovery, the offers of proof, affidavits and exhibits submitted, as well as the extensive briefs filed by the parties. Where practical and appropriate, specific citations to the voluminous factual record are provided.

**4.** Our "worst case" analysis, however, is based on *reasonable* inferences flowing from the allegations in Sears' pleadings, not on endless speculation devoid of a rational basis.

One contention requires particular attention. In Sears' latest pleading the claim is raised that EEOC Chairman Brown, who signed the charge

legal basis exists, we would then allow additional discovery to develop it fully.

The Commission's investigation of Sears officially began with the filing of EEOC Chairman William H. Brown's charge against Sears on August 30, 1973. Verification of the charge, as required by 42 U.S.C. § 2000e–5(b), was not effected until September 11, 1973, by which time, according to Sears, Brown's statutory term of office had expired and his power to verify had lapsed.

Prior to the Commission's charge, roughly in mid–1973, a task force was established to handle the investigation of Title VII violations by Sears. Personnel were selected from the National Programs Division ("NPD") of the Office of Compliance of the Commission.[5] Attorney David A. Copus, as Deputy Chief and later Acting Director of this body,[6] selected the staff. Mr. Copus clearly played a most important role in several phases of the Sears investigation prior to his April 11, 1977, departure from the Commission. His involvement included the signing of the "Notice of Charge" sent to Sears, the general supervising of the NPD Sears staff, periodic participation directly in pre–decision negotiations, and ultimately the writing (or some control over the writing) of the Commission's reasonable cause decision.[7] Moreover, it is alleged that Mr.

---

which served as the catalyst for the Sears investigation, was motivated by vindictiveness. Such vindictiveness allegedly flowed from Sears' advocacy of diminished enforcement powers for the Commission in hearings before Congress in 1972. All Sears has provided as evidence of Brown's vindictiveness is an unsubstantiated and undated quotation attributed to Brown upon "information and belief." In discussing the process of selecting nationwide employers, Brown allegedly remarked: "I don't care about the system, as long as you get Sears." Defendant's Offer of Proof, July 16, 1980, p. 12. There is not enough here to warrant additional discovery to support this aspect of the present motion.

It was William A. Carey, then General Counsel of the Commission, who recommended that "a member of the Commission issue a charge of employment discrimination against Sears. . . ." Carey Affidavit, Dec. 28, 1979, ‘ 8. Sears has, in fact, recognized that the principal basis for the recommendation was selected memoranda prepared by EEOC employees Kundar and Capello. See n.7, infra. The recommendation and underlying memoranda, in turn, were based on:

statistical data reflecting Sears' employment of minorities and females, Sears' history of compliance with Title VII of the Civil Rights Act of 1964, as amended, records and documents obtained and compiled by the U.S. Department of Labor during investigations of alleged violations of the Equal Pay Act of 1963, prior case decisions in employment discrimination litigation involving Sears and data concerning employment practices in the retail sales industry.

Carey Affidavit at ¶ 8.

Even if we were to find improper motivations on the part of Chairman Brown, there is substantial doubt whether this charge could serve as the basis for dismissal of this suit. See EEOC v. First National Bank of Jackson, 614 F.2d 1004 (5th Cir. 1980) (affirmative defenses of malicious prosecution and harassment insufficient as a matter of law in Title VII suit).

5. The Sears investigation was part of the EEOC–National Program Division's "Track I" strategy. Track I cases were to involve respondents "which could be viewed from the national standpoint." Affidavit of William Brown in Support of Plaintiff's Opposition to Defendant's Motion to Dismiss, Dec. 29, 1979, ¶ 3. In all, five respondents were investigated under Track I. Zugschwerdt Deposition, June 27, 1980, pp. 88, 127. Aside from Sears, General Motors, Ford, General Electric and the International Brotherhood of Electrical Workers were apparently named. See articles reprinted in Exhibit C–3 to Affidavit of Ray J. Graham in Support of Motion to Dismiss, Nov. 12, 1979, at Tab R. The Commission reached a conciliation agreement with General Electric in 1978. 1 Employ. Relations Report No. 33, at p. 9 (Dec. 5, 1979). The Sears investigation is the only case to date to result in litigation. The other cases are pending. Id. at 9.

6. The successor organization to the National Programs Division (NPD) was the Special Investigations and Conciliations Division (SICD), part of the Commission's Office of Compliance. Mr. Copus served as the Acting Chief of the SICD until his departure from the Commission in April 1977.

7. In one of its latest submissions, Sears apparently concedes that persons in addition to Copus–in particular Kathleen Kundar and Isabelle A. Capello–played a substantial role in the filing of the Commission's charge against Sears. Defendant's Opposition to Stay of Discovery, August 11, 1980, p. 9. Ms. Kundar ". . . under the supervision . . . of EEOC Assistant General Counsel Capello, drafted the memoranda . . . upon which Ms. Capello and, ultimately, EEOC General Counsel Carey, based their recommen-

Copus drafted the rules pursuant to which the NPD would process the charge, vesting considerable authority in himself in the overall coordination of the investigation with the district officers and the Office of General Counsel.

While employed at the Commission during the period of November 1973 to September 1974, Mr. Copus was a member of the Board of Directors of the National Organization for Women Legal Defense and Education Fund ("NOW–LDEF"), the litigating arm of the National Organization for Women ("NOW"). In May 1974, NOW mounted a publicity campaign against Sears, culminating in the adoption of a resolution at its Seventh National Conference in Houston calling for "action both nationally and locally against Sears to insure their compliance with equal employment opportunity laws." At approximately the same time a document entitled "A Litigation Strategy for NOW" was released, bearing Mr. Copus' name, in which it was stated that NOW must identify "legal issues, in areas of NOW priorities, which could be developed into precedent setting litigation, on a national level" and must continue "the current program of identifying and pooling all of the legal talent in NOW ..."

In this same document also appeared the name of Whitney Adams, who during the period of January–June 1974 was employed as a special assistant to then EEOC Chairman John H. Powell, Jr. Ms. Adams, in turn, was a member of the Board of Directors of NOW during the period February 1973–October 1975. While there is little indication[8] that Ms. Adams was directly involved in the Sears investigation during her tenure at the Commission, she did not hesitate to make her views known in 1974 on the prosecution of Sears for Title VII violations. In a NOW questionnaire, predating the May 1974 Houston convention, Adams as a candidate for a NOW directorship post made the following comment: Under the heading of "Supports Action Orientation for NOW" appeared "Supports action ... Nat'l targets with sim. actions as Sears, AT&T actions." As part of Adams' "Expertise in Feminist Issues/Actions" was the notation "Special Assistant to Chair, EEOC."

Beginning in May 1974, NOW filed a series of formal charges of employment discrimination against Sears. These charges were reviewed by Copus and other personnel of the NPD task force. These charges were filed by Copus as "suitable" for consolidation with the Brown charge.[9]

In late May 1974, EEOC Chairman Powell, apprised of Copus' seat on the NOW–LDEF Board, requested an opinion on the propriety of such activity from William Carey, EEOC General Counsel. On July 23, 1974, Mr. Carey responded, recommending Copus' terminating his NOW–LDEF directorship but not his post at the Commission or his involvement in the Sears investigation. This conclusion was arrived at because of the "sensitive nature of our [the

dations that a Commissioner's Charge be filed against Sears." *Id.* at 9.

8. Sears alleges that Adams "may have participated" in one Commission discussion on the Sears investigation, relating to the decision not to refile Chairman Brown's charge. Defendant's Evidence Obtained Through Limited Discovery, July 16, 1980, at p. 10, referring to Powell Deposition at pp. 258–259. It is also mentioned that Adams may have written one general memorandum about the National Programs Division for EEOC Chairman Powell. Defendant's Offer of Proof, July 16, 1980, at p. 7. Adams in her own affidavit states: "At no time during my employment at the EEOC did I ever handle any matter pertaining to Sears or the ongoing operations of the National Programs Division. Nor did I ever handle any

matter in which to my knowledge NOW was a charging party." Affidavit of Whitney Adams, Dec. 28, 1979, ' 5.

9. For purposes of this motion, we assume that the individual Title VII charges (filed by NOW and others) would not serve as an independent jurisdictional basis for this lawsuit. In many cases, no separate investigation of these charges—apart from the Brown charge—occurred. Moreover, the scope of these individual charges would not generally support a nationwide Title VII suit against Sears. Because of this view of the individual charges, we discuss only briefly the claim that certain EEOC employees who processed these charges had ties with NOW. See n. 45 *infra.*

EEOC's] responsibility under Title VII," and because

NOW–LDEF is put in a favored position by having him [Copus] serve on their Board of Directors even if in matters involving employment discrimination which come before the board for consideration, he declines to participate. His mere presence on the board would give the public the appearance of a conflict of interest. To further demonstrate this point, Mr. Copus is in direct contact with respondents in seeking information....

Further, the "activist nature of NOW," including its advocacy before the Commission, was perceived as a source of "embarrass[ment] to the Commission" if Copus continued his dual service. Still, the proposed disposition of the NOW–LDEF directorship was not intended in any way to limit Copus' membership in NOW or "active" participation in activities of the organization distinct from the "policy–making authority of a director."[10] Copus withdrew from service on the NOW–LDEF Board on September 6, 1974.

The Commission's decision, 77–21, was handed down on April 19, 1977, some 18 days after Copus left the Commission. In a 2–1 vote, reasonable cause was found to charge Sears with employment practice violations under Title VII.

Prior to the issuance of the decision, Commission officials apparently notified Sears of their intention to release information on the Sears investigation, including the Commission's decision, to individual charging parties. In response, Sears filed an action for declaratory and injunctive relief in the United States District Court for the District of Columbia to prohibit the dissemination of such information and to "enforce the confidentiality requirements of Title VII." Judge Gesell issued a temporary restraining order on June 1, 1977, enjoining the release of the Commission decision and certain other information. *See Sears, Roebuck and Co. v. EEOC*, 435 F.Supp. 751 (D.D.C.1977), *aff'd in part and rev'd in part*, 581 F.2d 941 (D.C.Cir.1978).[11] On about July 8, 1977, three copies of the Commission's decision were discovered missing from the Commission offices in Washington. Two of these copies later surfaced in the office of NOW's Chicago chapter and the Women's Equity Action League in Dallas. The third copy has never turned up. The source(s) of the leak were never uncovered. It is to be noted, however, that no finding of contempt of the injunction ever issued from District of Columbia District Court, nor is there any indication that such an order was sought.

Following the Commission's decision, conciliation efforts commenced on October 19, 1977. On February 27, 1978, during the pendency of these discussions, Sears petitioned the Commission for a reconsideration of the reasonable cause decision. The motion was denied on March 28, 1978. Negotiations continued until November 29, 1978, when they were terminated by the Commission. Bad faith is alleged against the EEOC for refusing to separately negotiate the individual charges (consolidated with the Brown charge) and the 'sex only' charges for settlement.

---

**10.** The Commission notes that because of "First Amendment considerations" mere membership in an organization appearing before the Commission does not constitute "even an appearance of a conflict of interest." Plaintiff's Memorandum in Opposition, p. 20, n. 22. The First Amendment is not an absolute, *Buckley v. Valeo*, 424 U.S. 1, 25, 96 S.Ct. 612, 637, 46 L.Ed.2d 659 (1976), especially where government employees are concerned. *See e. g., U. S. Civil Service Commission v. National Assoc. of Letter Carriers, AFL–CIO*, 413 U.S. 548, 556, 93 S.Ct. 2880, 2886, 37 L.Ed.2d 796 (1973) (First Amendment does not invalidate every restriction barring partisan political conduct by federal employees).

**11.** Judge Gesell subsequently ruled on July 26, 1977, that the EEOC was prohibited from releasing factual information obtained from Sears in predecision settlement negotiations to individual charging parties, but that the Commission could release to certain charging parties data accumulated pursuant to the EEOC's investigatory powers. *Sears, Roebuck and Co. v. EEOC*, 435 F.Supp. 751, 762 (D.D.C.1977). The District of Columbia Circuit Court of Appeals affirmed that portion of Judge Gesell's ruling enjoining disclosure and reversed as to the release of the investigatory file material. 581 F.2d 941 (D.C.Cir.1978).

This lawsuit was filed by the Commission on October 22, 1979.[12]

*Summary of Grounds for Dismissal*

Sears stakes its motion to dismiss on eight grounds, which may appropriately be classified into three groups. First, two claims focus on the Commission's failure to comply with certain alleged statutory prerequisites to suit: verification and conciliation. With respect to verification, Sears argues that the Brown charge was not properly verified and any effort to cure this defect was untimely because Brown's term of office had expired. The failure of the Commission to conciliate in good faith, in particular by refusing to consider settlement on other than a nationwide basis, is said to be an alternative bar to this court's jurisdiction.

Alleged improprieties and abusive practices in the Sears investigation serve as the common denominator for the next set of dismissal grounds. First and foremost are the real or apparent conflicts of interest flowing, *inter alia*, from (a) Copus' sitting on the Board of Directors of NOW–LDEF while ostensibly leading the Commission's investigation of Sears, (b) Adams' sitting on the Board of Directors of NOW while simultaneously serving as special assistant to the EEOC Chairman, and (c) the alleged conjugal relationship between Copus and Adams. Furthermore, it is contended that the Commission engaged in a "stigmatizing" publicity campaign against Sears, running afoul of the Due Process and Bill of Attainder Clauses of the United States Con-

stitution. As additional grounds, the Commission's summary refusal to grant a rehearing on the reasonable cause determination and its alleged violation of its own regulations are said to constitute due process deprivations.

As a wholly separate ground, Sears argues that any injunctive and back pay relief under the equal pay provisions of the FLSA and Title VII is barred under principles of res judicata and collateral estoppel. Such principles purportedly spring out of the adjudication of a nationwide equal pay injunction in *Usery v. Sears, Roebuck and Co.*, 421 F.Supp. 411 (N.D.Iowa 1976), *supplementing Brennan v. Sears, Roebuck and Co.*, 410 F.Supp. 84 (N.D.Iowa 1976).

*Observations on the Commission's Handling of the Sears Investigation*

Prior to engaging in a more detailed review of the defendant's contentions, it is appropriate to comment generally on the handling of the Sears investigation by the Commission. Aside from our "worst case" analysis, it appears that certain abuses by the Commission are not controverted.[13] High on this list and ripe for comment are the actions or perceived actions of David Copus. While not a voting commissioner, Copus' involvement in the Sears investigation was significant, and he exercised extremely poor judgment in accepting the directorship on the NOW–LDEF Board. Despite plaintiff's protestations to the contrary, there was sufficient guidance in the existing federal regulations[14] to have alert-

---

12. Sears also alleges that the Commission has utilized this lawsuit as a fishing expedition–employing "suing first and asking questions later" tactics. Defendant's Supplemental Memorandum of Law in Support of its Motion to Dismiss, July 16, 1980, p. 9. It is too early to evaluate these charges.

13. We are not alone in criticizing the Equal Employment Opportunity Commission for abuses in the investigation of discrimination under Title VII. *See EEOC v. Datapoint Corp.*, 457 F.Supp. 62, 67 (W.D.Tex.1978); *EEOC v. First Alabama Bank of Birmingham*, 440 F.Supp. 1381, 1385–1386 (N.D.Ala.1977); *EEOC v. Bendix Corp.*, 435 F.Supp. 76, 79–80 (M.D.Fla. 1977). *See also Jones v. Bell Helicopter Co.*, 614 F.2d 1389, 1391 (5th Cir. 1980) (Wisdom,

J.) (discussing EEOC processing of Title VII complaint).

14. The following regulations relating to EEOC employee misconduct were in effect:
29 C.F.R. § 1600.735–201 "Proscribed Actions":
An employee shall avoid any action, whether or not specifically prohibited by this part which might result in, or create the appearance of:
(a) Using public office for private gain;
(b) Giving preferential treatment to any person;
(c) Impeding Government efficiency or economy;
(d) Losing complete independence or impartiality;

ed Copus to an apparent conflict of interest by affiliating himself with a network of organizations [15] concerned with "targeting" Sears for Title VII violations. This "targeting" approach included a massive search for victims and the filing of charges before the Commission. Applying the regulatory language, it is inconceivable that Copus did not find his "independence" was undermined or the "confidence of the public" eroded by his connection with an interest group well–known for its advocacy before the Commission.

With respect to Ms. Adams, while she was not involved in the Sears investigation during her tenure at the Commission,[16] her mere presence on the NOW Board created an appearance of partiality and special deference to NOW–related petitions before the Commission. The public has the right to expect the staff of the Chairman of the Equal Employment Opportunity Commission to be free of the appearance of partiality.

■ Copus and Adams are not the only ones subject to criticism. The Commission has taken an almost cavalier approach to this matter, initially characterizing Copus' role in the Sears investigation as that of a mere "staff member" and his ties to the NOW organizations as "exceedingly insubstantial." While later recognizing that his ties were "questionable" and even "regrettable," the Commission too easily dismisses these concerns as being obviated by "more comprehensive guidance" procedures to be implemented "in the future." The Commission should not have allowed Copus to continue working on the Sears matter once his NOW–LDEF involvement was disclosed. His resignation from the NOW–LDEF Board did nothing to lessen the "appearance of impropriety" or the "compromising [of the Commission's] public image." [17] The decision to allow Copus to continue as a key figure in the Sears investigation turns on its head the high duty of a government attorney to strive toward fairness, independence and impartiality in official proceedings. *See American Cyanamid Co. v. FTC*, 363 F.2d 757, 767 (6th Cir. 1966); *United States v. Braniff Airways, Inc.*, 428 F.Supp. 579, 583 (W.D.Tex.1977).

An employment notice which appeared in a NOW newsletter also requires brief com-

(e) Making a Government decision outside official channels; or
(f) Affecting adversely the confidence of the public in the integrity of the Government.
&ast; &ast; &ast; &ast; &ast; &ast;
29 C.F.R. § 1600.735–203(a) "Outside employment and other activity":
General limitations: An employee shall not engage in outside employment or other activity not compatible with the full and proper discharge of the duties and responsibilities of his Government employment.
Subsequent to the Copus matter, certain amendments to this body of regulations were promulgated. The following paragraph was added to the list of *incompatible activities* under 29 C.F.R. § 1600.735–204(a) (44 Fed.Reg. 47518 (August 13, 1979)):
(6) Employment or activity rendered to persons to whom the official duties of the employees are directly related, or indirectly related if the indirect relationship is significant enough to permit the existence of a conflict or an apparent conflict of interest.
Moreover, advance approval of outside employment and activity has been mandated, 29 C.F.R. § 1600.735–204(b) (44 Fed.Reg. 47518 (Aug. 13, 1979)):
Advance approval. Employees must obtain advance written approval from their supervisor before undertaking outside employment for compensation or engaging in any outside activity or producing any material which is directly related to their position with the Commission or which is devoted substantially to the responsibilities, programs or operations of the Commission.

15. We agree with the defendant that the Commission's efforts to put a distance between NOW and NOW–LDEF must fail. The By–Laws of NOW–LDEF reveal that NOW–LDEF's entire membership consisted of "all current officers and members of the National Board of Directors of the National Organization for Women" plus NOW–LDEF directors. By–Law 3. NOW–LDEF's Board, in turn, is restricted to fifteen persons, three of whom must be the top officers of NOW, serving *ex officio*. By–Law 5.

16. See note 8 *supra*.

17. This language appeared in the July 23, 1974, memorandum of William A. Carey, EEOC General Counsel, to EEOC Chairman John Powell, appended to the Affidavit of Issie L. Jenkins, January 31, 1980.

ment. The April 1973 edition of *The Vocal Majority*, published by the District of Columbia Chapter of NOW, included the following excerpt:

> Within the next few weeks the Equal Employment Opportunity Commission will establish a new, 40–person unit to do high–powered nationwide investigations of the employment practices of the country's largest companies. Both clerical and professional positions will be available. . . .
>
> . . . The new group will use the AT&T case . . . as its model to go after the largest discriminators in the nation. The program promises to be dynamite!
>
> Anyone interested should contact David Copus, EEOC, 1800 G St., N.W., Washington, D.C. 20506. Phone: 343–3058 (office) and 965–2176 (home). Keep calling both numbers; time is of the essence!

This notice was apparently placed by Copus. It has not been established whether he had the Commission's approval. Although not mentioned by name, it seems likely that Sears is one of the companies referred to in the ad. Copus used extremely poor judgment in placing such an ad in a newsletter of one of the principal organizations seeking action against Sears. The appearance of partiality on the part of the Commission is palpable.

Despite these improprieties by the EEOC, we do not find the *extreme* sanction of dismissal to be warranted in this case.[18] We have been cited no case where dismissal was ordered because of similar misconduct on the part of the EEOC. The principal cases cited by defendant involve the approval of agency action by the court, *Air Transport Association of America v. Hernandez*, 264 F.Supp. 227 (D.D.C.1967), *NLRB v. Autotronics, Inc.*, 596 F.2d 322 (8th Cir. 1979); or even the "sanctioning

[of] such [agency] abuse." *SEC v. Wheeling–Pittsburgh Steel Corp.*, 482 F.Supp. 555 at 565 (W.D.Pa.1979), *reversed* 49 U.S.L.W. 2164 (3rd Cir. Aug. 27, 1980). Courts have dismissed Title VII claims only where egregious conduct has occurred: A personal and pecuniary "vendetta," campaign, *EEOC v. First Alabama Bank of Birmingham*, 440 F.Supp. 1381, 1385 (N.D. Ala.1977), *affirmed*, 611 F.2d 132 (5th Cir. 1980); actual harassment and a "fishing expedition," *EEOC v. Anchor Continental, Inc.*, 74 F.R.D. 523, 528 (D.S.C. 1977); *but see EEOC v. First National Bank of Jackson*, 614 F.2d 1004 (5th Cir. 1980) (harassment does not state affirmative defense to Title VII claim); extreme case of latches, *EEOC v. C&D Sportswear Corp.*, 398 F.Supp. 300 (M.D.Ga.1975), or no attempt at conciliation, *EEOC v. Westvaco Corp.*, 372 F.Supp. 985 (D.Md.1974).

The Fifth Circuit Court of Appeals in *EEOC v. First National Bank of Jackson*, *supra*, recently held that malicious prosecution or harassment, even though reprehensible, is insufficient as a matter of law to state an affirmative defense to a Title VII action. The allegations raised by the defendant bank in their "counterclaim" in *Jackson* are similar to Sears' allegations in the instant case:

> [T]he purpose of the EEOC's lawsuit was to "defraud, vex, and harass" the bank and other employers "maliciously and for ulterior purposes" by means of "unlawfully conceived, groundless, vexatious, and fraudulent charges."

614 F.2d at 1007. The court broadly defined malicious prosecution to include an action "begun in malice, without probable cause to believe it can succeed, . . . for the mere purpose of vexation or injury." *Id.* at 1007, n. 3. In reversing the district court's

---

**18.** The dismissal of Title VII, suits is generally disfavored by the courts. *See e. g., EEOC v. Airguide Corp.*, 539 F.2d 1038 (5th Cir. 1976) (EEOC's failure to satisfy statutory requirement of timely notice of charge did not justify dismissal where no prejudice resulted); *EEOC v. Red Arrow Corp.*, 392 F.Supp. 64 (E.D.Mo. 1974) ("severe sanction of dismissal" not war- ranted for EEOC solicitation of victims in the press). *Cf. Georator Corp. v. EEOC*, 592 F.2d 765, 769 (4th Cir. 1979) (due process not offended by failure to provide hearing on reasonable cause determination). *See also* discussion of the dismissal sanction and the public interest in note 22 *infra*.

dismissal of the Title VII suit,[19] the Court of Appeals stated:

> *Assuming* that the bank's allegations of malicious prosecution are meritorious, they could not constitute an affirmative defense to alleged Title VII violations.... The so—called affirmative defense of malicious prosecution and harassment did not relate to the primary issue in this Title VII action—whether the bank unlawfully discriminated against blacks and black males.

*Id.* at 1008 (emphasis in original). *Accord, EEOC v. Sears, Roebuck and Co.*, 490 F.Supp. 1245, 1254 (M.D.Ala.1980) [hereinafter cited as "*Sears–Alabama*"] (summary judgment on the ground that the EEOC engaged in misconduct to harass Sears held "inappropriate," *citing EEOC v. First National Bank of Jackson*). *See also SEC v. Geotek*, [1974–1975 Transfer Binder] Fed. Sec.L.Rptr. 97643, 97646 (N.D.Cal., March 28, 1975) (defenses of "lack of good faith in bringing, and lack of good grounds for, the SEC action" were of "questionable validity").

In the instant case a trial *do novo* of the Title VII claims[20] against Sears in this court will attenuate any taint flowing from the conduct of Copus, Adams and the Commission generally.[21] We note that a majori-

---

**19.** The district court's dismissal was based on the EEOC's failure to comply with a discovery order relating to allegations of harassment and malicious prosecution. *See EEOC v. First National Bank of Jackson*, 614 F.2d 1004, 1006–1007 (5th Cir. 1980).

**20.** The term *de novo* is somewhat of a misnomer in describing this court's responsibility in the hearing of Title VII claims. As defined in Black's *Law Dictionary* (4th ed. 1968), *de novo* means "anew," "afresh," "a second time." However, this court adjudicates Title VII claims *for the first time*; there is no prior adjudication by the EEOC. *See* discussion of EEOC's powers at pp. 12–15 of the text. Thus "trial *de novo*," the commonly used term which we adopt hereafter, does not capture the full extent of this court's responsibility in Title VII actions.

**21.** Defendant cites *Ward v. Village of Monroeville*, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972) and *Jerrico, Inc. v. Department of Labor*, No. 78–0128 (D.D.C. May 7, 1979), *appeal filed sub nom. Marshall v. Jerrico, Inc.*, 444 U.S. 948, 100 S.Ct. 419, 62 L.Ed.2d 318 (1979), for the proposition that a trial *de novo* on the Title VII claims in this court cannot attenuate any taint found to attach to some part of the Commission's investigation. However, both of these cases involved bias by an official in an *adjudicative* proceeding. The EEOC does not have any adjudicative functions; its role is purely investigatory. *See* pp. 254–255 *infra*. Indeed, this distinction was crystallized in *Monroeville*.

*Ward v. Village of Monroeville* involved the trial of the petitioner for traffic offenses by the village mayor, who was also responsible for the finances of the village. The Supreme Court found a due process violation resulting from the pecuniary interest of the mayor/judge. In rejecting the correction of any "unfairness" at the "trial level" through a trial *de novo* in the County Court of Common Pleas, the Court made the following statement upon which the defendant relies: "Petitioner is entitled to a neutral and detached judge in the *first instance*." 409 U.S. at 61–62, 93 S.Ct. at 83–84 (emphasis added). In the instant case, the first opportunity that the Title VII claims can be brought before a "neutral and detached judge" is in this present district court proceeding.

Moreover, the Supreme Court in *Marshall v. Jerrico, Inc.* reversed the district court's ruling that a *de novo* hearing before an administrative law judge cannot cure any bias in the assessment of civil penalties against child labor violators by assistant regional administrators of the Department of Labor. 446 U.S. 238, 100 S.Ct. 1610, 64 L.Ed.2d 182, 48 U.S.L.W. 4485 (1980). The Court specifically noted that assistant regional administrators

> cannot be equated with the kinds of decision-makers to which the principles of ... *Ward* have been held applicable. He is not a judge. He performs no judicial or quasi–judicial functions. He hears no witnesses and rules on no disputed factual or legal questions.

446 U.S. at 247, 100 S.Ct. at 1615. We believe these statements aptly describe the EEOC commissioners and staff in their investigation of Title VII charges.

We find our case analogous to *Hackley v. Roudebush*, 520 F.2d 108 (D.C.Cir. 1975) and find guidance in Judge Wright's reasoning there. In *Hackley* it was held that Congress intended to provide federal employees with a right to a trial *de novo* on Title VII claims in federal district court. This procedure, Judge Wright explained, was directed at least in part at overcoming any apparent conflicts of interest arising from a government agency (Civil Service Commission) handling discrimination claims brought by federal employees. 520 F.2d at 149–150, n. 172. Similarly, in the instant case, trial *de novo* 'plus' (see note 20 *supra*) will cure an appearance of impropriety in the Sears investigation.

ty of the circuit courts have held that it is not reversible error to discount or even exclude the administrative record and findings of the Commission in adjudicating a Title VII claim. *Francis–Sobel v. University of Maine*, 597 F.2d 15, 18 (1st Cir. 1979) (exclusion not error), *cert. denied*, 444 U.S. 949, 100 S.Ct. 421, 62 L.Ed.2d 319; *Georator Corp. v. EEOC*, 592 F.2d 765, 769 (4th Cir. 1979) (exclusion of record not error). *Accord, Cox v. Babcock and Wilcox Co.*, 471 F.2d 13, 15 (4th Cir. 1972); *Heard v. Mueller Co.*, 464 F.2d 190, 194 (6th Cir. 1972) (exclusion not error, within the sound discretion of the district court); *Walton v. Eaton Corp.*, 563 F.2d 66, 75 (3d Cir. 1977) (exclusion of EEOC findings of fact and determination on merits not error, but district court admitted certain documents and permitted EEOC investigator to testify); *Gillin v. Federal Paper Board Co.*, 479 F.2d 97, 99–100 (2d Cir. 1973) (EEOC investigative report excluded, but district court permitted investigator to testify). *But see Bradshaw v. Zoological Society of San Diego*, 569 F.2d 1066, 1069 (9th Cir. 1978) (error to exclude, but weight determined by district court); *Smith v. Universal Services, Inc.*, 454 F.2d 154, 157–158 (5th Cir. 1972) (error to exclude, but report nonbinding and to be accorded weight deemed appropriate by the district court). Nor can we ignore on this motion to dismiss the explicit policy choice of Congress to eliminate discrimination. *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 47, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974) (Title VII policy of "the highest priority"), *quoting Newman v. Piggie Park Enterprises*, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968).[22]

### EEOC Legislative History

Because of the emphasis we place on the *de novo* powers of this court, it is useful to examine the statutory framework within which the Equal Employment Opportunity Commission operates.

The Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, was enacted to assure equality of employment opportunities by eliminating those practices that discriminated on the basis of race, color, religion, sex, or national origin. As part of this legislation, Congress created the Equal Employment Opportunity Commission. Prior to 1972, the EEOC acted essentially as a conciliatory agency, relying on voluntary and informal methods of dispute resolution.

In 1972 a sweeping congressional debate on the scope of the Commission's powers took place. On the one hand, it was argued that the Commission should be given cease and desist authority with limited court re-

---

**22.** There is support for considering "the strong public interest" which nonadjudicating administrative agencies are designed to vindicate as one ground for rejection of the dismissal sanction. For example, in *Wellman v. Dickinson*, 79 F.R.D. 341 (S.D.N.Y.1978), an SEC enforcement proceeding, it was alleged that the Commission's investigation was

> instigated as a result of political pressure rather than to enforce existing law; that agents of the Commission attempted to obtain information and documents from certain of the Defendants without consulting their counsel; and that the SEC decided in violation of its own regulations to turn over certain privileged papers to private litigants . . . .

79 F.R.D. at 349. The court expressed serious doubt as to whether the sanction of dismissal would be appropriate where "the SEC claims to have found evidence of illegal conduct and is prepared to establish those claims at trial:" "To accept such an interpretation would be to disregard the strong public interest which such suits are designed to vindicate, or at least rele-

gate that interest to a subordinate position." 79 F.R.D. at 350 (citation omitted). Judge Carter ultimately rejected defendants' allegations as a basis for dismissal. 475 F.Supp. 783, 836–837 (S.D.N.Y.1979). *Accord, SEC v. Jones*, 15 F.Supp. 321, 322 (S.D.N.Y.), *aff'd on other grounds*, 85 F.2d 17 (2d Cir.) (per curiam), *cert. denied*, 299 U.S. 581, 57 S.Ct. 46, 81 L.Ed. 428 (1936) ("It is fantastic to say that because this suit was preceded by an investigation termed unlawful, the suit must be thrown out of court").

Similarly, "[t]he EEOC exists to advance the public interest in preventing and remedying employment discrimination." *General Telephone Co. v. EEOC*, 446 U.S. 318, 331, 100 S.Ct. 1698, 1707, 64 L.Ed.2d 319 (1980). At least one court has refused to dismiss a Title VI suit brought by the Commission because of "the possible adverse effects upon the real parties in interest." *EEOC v. Red Arrow Corp.*, 392 F.Supp. 64 (E.D.Mo.1974) (EEOC placement of newspaper ads to solicit victims of defendant's discrimination).

view to strengthen the Title VII enforcement mechanism. Among the reasons advanced for this option were: complex discrimination cases result in enormous expenditures of judicial resources; administrative tribunals are better equipped with experts and better suited to rapid resolution of issues; informal rules of evidence in administrative hearings offer less opportunity for dilatory tactics; and the existence of administrative sanctions will encourage settlements. *See Legislative History of the Equal Employment Opportunity Act of 1972 Compendium,* 92d Cong., 2d Sess., Committee Print of the Senate Subcommittee on Labor of the Senate Committee on Labor and Public Welfare (hereinafter cited as "Legislative History") at 70–71 (House report), 238 (remarks of Rep. Drinan), 426–428 (Senate Report), 798 (remarks of Sen. Mondale), 811–815 (remarks of Sen. Williams), and 835–837 (remarks of Sen. Humphrey). On the other hand, it was argued that the EEOC should have the ability to institute civil actions, with trial *de novo* authority vested in the federal district courts. The following reasons were put forward for this approach: a court is a more appropriate forum in which to resolve civil rights questions since procedural safeguards are provided; federal judges enjoy great respect; the judge is impartial; the judge can fashion a complete remedy; the federal discovery rules greatly facilitate the collection of evidence for trial; hearing examiners tend to be inadequate factfinders; administrative tribunals are less impartial, legal arguments are not always effectively brought forth, and procedural rules are virtually nonexistent; administrative tribunals are too sensitive to political winds, while courts provide greater independence. *See Legislative History* at 118–123 (Minority view on Hawkins Bill in House Report), 219 (remarks of Reps. Erlenborn and Railsback), 221 (remarks of Rep. Railsback), 493–496 (individual views of Sen. Dominick in Senate Rep.), 692–697 (remarks of Sen. Dominick), 837–839 (remarks of Sens. Talmadge and Chiles), 1013 (remarks of Sen. Gambrell), 1446–1447 (remarks of Sen.

Hruska) and 1485 (remarks of Sen. Dominick). *See also Hackley v. Roudebush,* 520 F.2d 108, 123 n. 57 (D.C.Cir. 1975) (Wright, J.).

The proponents of full judicial hearings on the merits prevailed. Equal Employment Opportunity Act of 1972, Public Law 92–261, 86 Stat. 103. The consideration which prompted Congress to decide in favor of trial *de novo* enforcement, such as the greater procedural fairness and independence of the courts, are directly relevant to the defendant's allegations of EEOC misconduct.

■ Under the current enforcement scheme, the Commission has the authority to investigate charges of discrimination, to promote voluntary compliance with the requirements of Title VII, and to institute civil actions against employers or unions named in a discrimination charge. *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974). The Commission's proceedings are nonbinding and nonadjudicative, *Alexander v. Gardner–Denver, supra,* at 44, 94 S.Ct. at 1017; *EEOC v. Raymond Metal Products Co.,* 530 F.2d 590, 593 (4th Cir. 1976); *EEOC v. Kimberly–Clark Corp.,* 511 F.2d 1352, 1361 (6th Cir. 1975); the Commission's responsibilities are "only investigative." *Georator Corp. v. EEOC,* 592 F.2d 765, 768 (4th Cir. 1979). *See Stewart v. EEOC,* 611 F.2d 679, 683–684 (7th Cir. 1979) (no determinate consequences flow from EEOC investigation, dictum). A deliberate decision was made by the Congress to not give the Commission the powers which had been "bestowed on older regulatory agencies such as the National Labor Relations Board...." *EEOC v. Contour Chair Lounge Co.,* 596 F.2d 809, 813 (8th Cir. 1979). Nor was it intended that the Commission would be entitled to the deferential "substantial evidence" or "clearly erroneous" rules of judicial review. *EEOC v. Contour Chair Lounge Co., supra,* at 813. Adjudication of Title VII claims was to be "the exclusive function of the courts."

*EEOC v. General Electric Co.*, 532 F.2d 359, 370 (4th Cir. 1976).

*Analysis of Individual Grounds for Dismissal*

### A. Statutory Prerequisites to Suit

Before the Commission can institute a civil action in the federal courts, certain conditions precedent to suit must be met.[23] As outlined in *EEOC v. Raymond Metal Products Co.*, 530 F.2d 590, 592 (4th Cir. 1976), there are four major stages of the Commission's investigative process:

> These steps are service of a notice of the charge, investigation, determination of whether there is reasonable cause to believe the charge is true, and endeavors to eliminate the alleged unlawful practice through conference, conciliation, and persuasion. The Commission can institute suit only if it has been unable to secure an acceptable conciliation agreement.

As noted, two of Sears' grounds for dismissal are directed at the Commission's alleged failure to satisfy the charge and conciliation requirements.

### 1. Verification of the Charge

Sears alleges that the Commission's charge was never properly verified and that this is a jurisdictional bar to this suit.[24] It is undisputed that Chairman Brown's charge against Sears was signed on August 30, 1973. However, the charge was not sworn to at that time. Brown subsequently verified the charge, or purported to do so, on September 11, 1973. Two issues must be resolved here: (1) Since the Brown charge was not originally under oath, could a later verification be effective?[25] and (2) if so, was Brown a *de jure* or *de facto* Commissioner on September 11, 1973, for purposes of amending and validating the charge?

A Title VII charge filed against an employer must be "in writing under oath or affirmation."[26] 42 U.S.C. § 2000e–5(b). The purpose of verification is to protect the employer against the filing of frivolous claims and harassment. *Stewart v. Core Laboratories, Inc.*, 460 F.Supp. 931, 934 (N.D.Tex.1978); *Weeks v. Southern Bell Telephone & Telegraph Company*, 408 F.2d 228, 231 (5th Cir. 1969). At the same time,

---

**23.** In using the term "conditions precedent to suit" we are not suggesting that *every* element of the EEOC investigatory process is a jurisdictional requirement. *See* discussion of whether, in fact, the verification of a charge is "jurisdictional," at note 28 *infra*.

**24.** *Two internal memoranda of the EEOC have discussed admitted defects in the Brown charge. See* Exhibits H and I to Defendant's Evidence Obtained Through Limited Discovery, July 16, 1980. Although the Commission has asserted various privileges affecting their admissibility, we need not rule on these claims. The statements in these memoranda merely bring to our attention a problem which we *already know exists. The fact that then EEOC General Counsel Carey sought to avoid "the need to litigate" the validity of Brown's untimely verification is, in fact, irrelevant for our purposes.* It is for this court, not EEOC counsel, to decide whether defects in the charge are curable.

We note generally that statements by EEOC personnel, past or present, to the effect that Sears *"has been at the vanguard of voluntary affirmative action,"* (Affidavit of Ray J. Graham in Support of Defendant's Motion to Dismiss, ¶ 96, quoting 1979 statement of EEOC Acting General Counsel Issie Jenkins) do not constitute grounds for the dismissal of this suit against the Commission. *Accord, Sears–Geor-*

*gia,* Slip Op. at 11: "The existence of contradictory opinions within the Commission or expressions of doubt by plaintiff [EEOC] as to possible flaws in its case does not constitute proof of the misuse of judicial process."

**25.** As we have already indicated, we are not relying on the individual charges filed with the Commission as an independent basis for this suit. *See* note 9 *supra*.

**26.** The text of this provision is as follows:

> Charges shall be in writing under oath or affirmation and shall contain such information and be in such form as the Commission requires.

42 U.S.C. § 2000e–5(b).

This sentence does not specifically say that the "oath or affirmation" requirement applies to the Commission as well as to private charging parties. The sentence could be read as applying only to charges which must "contain such information and be in such form as the Commission requires;" that is, charges filed by someone *other than* the Commission. We note, however, that the term "charge" is broadly used in § 2000e–5. In any event, we do not rest our decision as to verification on this point. *But see* discussion of the legislative history of the "oath or affirmation" language, at note 28 *infra*.

the congressional purpose behind the Commissioner's charge is, *inter alia*, to enable aggrieved persons to have charges processed under circumstances where they are unwilling to come forward publicly for fear of reprisal. *See* Senate Report No. 415, 92d Cong., 1st Sess. 26 (1971) [1972 Amendments to Civil Rights Act of 1964].

Few cases have discussed a Commissioner's charge, and there is little authority on the question of whether untimely verification is a bar to a suit by the Commission. Defendant relies heavily on *EEOC v. Appalachian Power Co.*, 13 CCH Employ.Pract. Dec. ¶ 11,293 (W.D.Va.1976), *affirmed*, 568 F.2d 354 (4th Cir. 1978). In *Appalachian Power*, then–Commissioner Brown filed an unsworn charge against an employer. The court dismissed the Commission action, finding that the verification requirement was mandatory. 13 CCH Employ.Pract. Dec. at p. 5968. The case is distinguishable, however, from the instant situation. Specifically, the court held that an improperly notarized *affidavit*, pleading inadvertent error in the failure to swear to the charge, filed some three years after the signing of the charge, *during* the course of litigation,

did not cure the defect in the *Appalachian* charge. *Id.* at 5968–5969. Despite its statement that verification is mandatory, the district court left open the possibility that under certain circumstances the defect in a charge could be cured by amendment: [27]

> The Commission has not seriously attempted to convince the court, either in its Memorandum or at oral argument that the defective affidavit constituted a *valid amendment* of the charge and the court does not so hold at this time.

*Id.* at 5969 (emphasis added). Moreover, the court discounted Commissioner Brown's eleventh hour affidavit because the Commission's reasonable cause determination "specifically rejected two of Commissioner Brown's allegations, notably hiring and training discrimination." *Id.* In the instant case, of course, the failure to verify was not corrected by affidavit during the course of litigation and Brown's charge was approved by the Commission on a 2–1 vote.

■ We doubt that verification is, in fact, an absolute jurisdictional requirement,[28] but in any event we find that subse-

---

**27.** The Fourth Circuit Court of Appeals in *EEOC v. Appalachian Power Co.*, 568 F.2d 354, 355 (4th Cir. 1978), essentially incorporated by reference the district court's decision. There is nothing in the opinion which alters or casts doubt upon the quoted language and reasoning.

**28.** Substantial doubt exists over whether the timely verification of a Commissioner's charge is a jurisdictional prerequisite. Courts discussing the verification and charge elements in strict terms have still recognized the possibility that a defect could be cured. *See, e. g., EEOC v. Appalachian Power Co.*, 13 CCH Employ. Pract.Dec. ¶ 11,293 (W.D.Va.1976), *affirmed*, 568 F.2d 354 (4th Cir. 1978). Such a usage of the term "jurisdictional" is inconsistent with its meaning. *See McArthur v. Southern Airways, Inc.*, 569 F.2d 276, 278–280 (5th Cir. 1978) (Rubin, J., dissenting) (questioning use of the term "jurisdictional" where modification or waiver of Title VII requirements is allowed); *Reeb v. Economic Opportunity Atlanta, Inc.*, 516 F.2d 924, 927 (5th Cir. 1975) (Wisdom, J.) ("[c]onceptual confusion springs from a court's describing" an EEOC requirement as "jurisdictional," but granting equitable modification of that requirement).

Similarly, the two Sears cases dismissed, *inter alia*, for invalid charges do not support the

position that verification is a *jurisdictional* requirement. The court in *Sears–New York* simply did not address this question. The court in *Sears–Alabama* applied a prejudice standard to the verification requirement and further noted "that the weight of authority indicates that not all of the requirements of § 2000e–5 are mandatory ...." *Sears–Alabama*, 490 F.Supp. at 1253.

Finally, in reviewing the legislative history of the 1972 Amendments to Title VII of the Civil Rights Act of 1964, it seems unlikely that the "oath or affirmation" language represented any significant departure from prior practice. There is certainly little to indicate that the inclusion of this language was, as defendant argues, intended to make Commission verification an absolute jurisdictional requirement. While the district court in *Appalachian Power* found a study of the legislative history "unnecessary," 13 CCH Employ.Pract.Dec. at p. 5968, and the Fourth Circuit in affirming that decision saw no reason to look beyond the "plain language" of the statute, 568 F.2d at 354, we find this examination revealing. *Compare Reporters Comm. for Freedom of Press v. Sampson*, 591 F.2d 944, 948 (D.C.Cir.1978) (even the most basic principles of statutory construction applied to seemingly clear congressional lan-

quent affirmation, some twelve days late, by a *de jure* or *de facto* Commissioner can constitute a "valid amendment" to the charge. This approach is in harmony with the view expressed by Judge Varner in the *Sears–Alabama* case:

> [T]he Court is of the opinion that the verification requirement can be cured by amendment, even after the term of the Commissioner has expired, if the respondent [employer–defendant] is not prejudiced thereby.

*Sears–Alabama*, at 1252 (citations omitted).

In *Sears–Alabama*, the court went on to find that prejudice resulted because the EEOC issued "across–the–board, catchall pattern or practice charges against [a] nation–wide employer only to turn around and bring suit against one particular facility [Montgomery store] on limited bases and issues of discrimination." *Id.* at 1252. Indeed, Judge Varner characterized this charging practice as directed to "the very abuse that Congress intended to prevent" by requiring verification. *Id.* at 1252. Furthermore, he opined· "This Court can think of no better example of a situation where the requirement of verification should be more vigorously adhered to . . . ." *Id.* at 1252.

The instant Sears case stands in marked contrast, however, to the Alabama suit. There was no such variance between the scope of the Commissioner's charge and the scope of the lawsuit: both the charge and the suit allege nationwide discrimination.[29]

---

guage must yield to contrary evidence of legislative intent).

The Commission practice prior to the 1972 amendments was that the verification requirement was applied only to charges made by private persons, not to those filed by the Commission itself. The language was:

> Whenever it is charged in writing under oath by a person claiming to be aggrieved, or a written charge has been filed by a member of the Commission where he has reasonable cause to believe a violation of this title has occurred . . . .

42 U.S.C. § 2000e–5.

In 1972, Congress engaged in a broad review of the powers of the Commission. *See* text at pp. 253–255 *supra.* Prior to the floor debate, any reference to an oath was inexplicably deleted from the Senate bill, S.2515. Senators Allen and Ervin proposed an amendment to the bill to add the following definition of the word "charge:" "an accusation of discrimination supported by oath or affirmation." *See* Legislative History of the Equal Employment Opportunity Act of 1972, P.L. 92–261, Committee Print of the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 92d Cong., 2d Sess. (Nov. 1972) ("Legislative History") 1672 *et seq.*, reprinting discussion from Congressional Record (Senate), Feb. 21, 1972. They regarded their amendment as constituting "no change in the requirement." *Id.* at 1672 (remarks of Senator Allen). "[A]ll this amendment would do would be to go back to the present law and make no change in the requirement, meaning charges are to be filed and made under oath in writing." *Id.* at 1672 (Sen. Allen).

Ultimately, Senator Williams suggested an amendment to this amendment, incorporating the language which we presently have in § 2000e–5(b):

> Charges shall be in writing under oath or affirmation.

*Id.* at 1673. Senator Williams pressed for the inclusion of this language at the beginning of the discussion of the term "charge" in the legislation. He regarded his amendment as not affecting the substance or altering in any way existing practice. As expressed, the amendment was intended to make the Senate bill "conform to present law." *Id.* at 1672–1673 (remarks of Senator Williams).

The House bill, as introduced, contained no oath requirement. H.R.1746, Legislative History at pp. 1, 3. No debate occurred on the floor with respect to this requirement. H.R.1746, as passed by the House, however, incorporated verbatim the pre–1972 oath language. Legislative History at 327. The House provisions were altered in the conference committee to conform to the amended Senate version.

This language, then–the Senator Williams' amendment to the amendment of Senators Allen and Ervin–was enacted into law. Any notion that the language change was intended to introduce a new limitation on Commission action is not supported by the facts. There was no discussion of any stricter oath requirement for Commissioners' charges in the legislative history. The Senate–House Conference Managers Report explaining the new Title VII provisions mentions only in passing the oath requirement, with no indication that the 1972 language resulted in any change from existing practice. *See* Legislative History at 1814. If anything, the sponsors of the oath amendments, as revealed in their comments, believed that the pre–1972 language directed the filing of Commissioners' charges under oath.

**29.** Admittedly, the Brown charge alleged nationwide sex, race and national origin discrimination, while the suit in this district rests only on nationwide sex discrimination.

Nor was Sears put to the expense and effort of investigating and preparing to defend against later withdrawn general discrimination charges. *Compare Sears–Alabama*, at 1252. We do not find any prejudice, substantial or otherwise, resulting to the defendant here from the untimely verification of Chairman Brown's charge.[30]

The leading case applying the prejudice standard to violations of the procedural requirements of 42 U.S.C. § 2000e–5(b) is *EEOC v. Airguide Corp.*, 539 F.2d 1038 (5th Cir. 1976). In *Airguide*, the Fifth Circuit held that where there was no clear showing that the employer had been prejudiced by not receiving timely notice of the charge, as required by 42 U.S.C. § 2000e–5(b), the Commission's suit was not barred. Noting that there was support for the view that such steps as the 10–day notice of charge rule of § 2000e–5(b) were "conditions precedent to suit by the EEOC," the court observed:

> ... such a position must be balanced against the observation ... that "[w]hen an agency neglects to follow a procedural rule but its failure inflicts no significant injury on the party entitled to observance of the rule, the error does not prevent further administrative or judicial action."

539 F.2d at 1042. This principle has been recognized to be especially applicable when the agency is not itself adjudicating, but is conducting merely preadjudicative activities. *Hannah v. Larche*, 363 U.S. 420, 422, 440–452, 80 S.Ct. 1502, 1513–1520, 4 L.Ed.2d 1307 (1960); *EEOC v. Kimberly–Clark Corp.*, 511 F.2d 1352, 1361 (6th Cir. 1975). *See also EEOC v. Radiator Specialty Co.*, 610 F.2d 178, 183 n. 6 (4th Cir. 1979) (*Air-*

*guide* prejudice standard applied to defect in statutory notice of charge).

We do not believe the inadvertent [31] failure by Chairman Brown to verify the charge against Sears when it was filed differs significantly from the failure of the Commission to serve the employer with timely notice of the charge in the *Airguide* case.[32] Both requirements are written into the statute, 42 U.S.C. § 2000e–5(b). The purpose of each requirement is to ensure procedural fairness. Nonetheless, there is no indication that "Congress intended to prevent the Commission from suing because of an unintentional defect in compliance" which does not cause prejudice. *EEOC v. Airguide Corp., supra*, 539 F.2d at 1041.

Furthermore, the conclusions of Judge Freeman in the parallel *EEOC v. Sears, Roebuck and Co.* case, Civil Action 79–1957A, U.S. District Court for the Northern District of Georgia, Memorandum Opinion (March 14, 1980) ("*Sears–Georgia*"), are persuasive on the *de minimus* effect of Chairman Brown's untimely verification:

> Here, only twelve days after the original filing of the charge, and before the Commission engaged in any investigation or conciliation proceedings, the charge was adequately remedied by the Commissioner's affidavit.

> \* \* \* \* \* \*

> We see no reason in this case to deny the Commission the right to cure the defect.... The focus of our inquiry should not be whether the EEOC perfectly complied with the required procedures, but rather whether the defendant was prejudiced by the twelve–day delay....

---

**30.** Neither do we find any prejudice resulting from Chairman Brown's validation of the charge as a *de facto*, rather than *de jure*, Commissioner. *See* discussion in text at pp. 259–262 *infra*.

**31.** There is no evidence or even a suggestion by Sears that Chairman Brown *intentionally* failed to verify the charge on August 30, 1973. At most, Sears argues that "[t]he decision by Chairman Brown to sign the Commissioner's Charge on August 30, 1973, was made in great haste...." Defendant's Offer of Proof, July

16, 1980, p. 14. *See also* Brown Affidavit, ¶ 5 ("The failure was merely an oversight on my part.")

**32.** There was some evidence that the notice of the charge was mailed in *Airguide*. However, we still regard the court's holding that "Congress [never] intended to prevent the Commission from suing because of unintentional defect in compliance ..." as good authority in the instant case. *EEOC v. Airguide Corp.*, 539 F.2d 1038, 1041 (5th Cir. 1976).

Sears alleges no prejudice whatsoever arising from the late verification. *Sears–Georgia*, Slip Opinion at 9.

Having decided that the verification defect could be cured and that the amendment did not prejudice Sears, the question remains whether EEOC Chairman Brown had either *de jure* or *de facto* authority to verify the charge. Brown filed the Commissioner's charge against Sears on August 30, 1973, and subsequently verified it on September 11, 1973. The parties agree that his official term of office expired on July 1, 1973. Brown, however, remained in office after this time subject to a statutory holdover period. It is the duration of this period which is in dispute.

Section 705 of Title VII, 42 U.S.C. § 2000e–4(a), provides in relevant part:

Any individual chosen to fill a vacancy shall be appointed only for the unexpired term of the member whom he shall succeed, and *all members of the Commission shall continue to serve until their successors are appointed and qualified, except that no such member of the Commission shall continue to serve (1) for more than sixty days when the Congress is in session unless a nomination to fill such vacancy shall have been submitted to the Senate, or (2) after the adjournment sine die of the session of the Senate in which such nomination was submitted.* (Emphasis added)

Before analyzing the length of the holdover period, certain background information is necessary. First, it is clear that the holdover term was intended "to expire

when either the President fails to nominate a successor within sixty days, or the Senate fails to act on a nomination before adjourning *sine die* at the end of the session." *Sears–Georgia*, Slip Op. at 5. Second, although the President announced his intention to nominate John H. Powell, Jr. to succeed Chairman Brown on August 17, 1973, while Congress was in adjournment for the summer recess, 9 *Weekly Compil. of Pres. Doc.* 1003–1004 (Aug. 17, 1973), the nomination was not submitted to the Senate until September 5, 1973. 119 Cong.Rec. 28570 (1973). This submission was sixty-six days after the expiration of Brown's official term.[33] Mr. Powell was, however, confirmed by the Senate prior to the adjournment *sine die* of the 93rd Congress, 1st Session. *See* 119 Cong.Rec. 43201 (December 21, 1973). We believe these facts render inapplicable subparagraph (2) of the holdover provision and the proviso to subparagraph (1).

In order, then, for Chairman Brown to have been a *de jure* Commissioner on September 11, 1973, the date he sought to verify the original charge, the sixty–day holdover period must have included that date. This result can only be reached by arguing, as plaintiff does, that the phrase "sixty days when the Congress is in session" in the holdover statute refers only to legislative days of Congress, not calendar days. We reject this contention and believe that Congress "was in session" during the summer recess. This view is supported by the language of the statute[34] and is consistent with the positions taken by those courts

---

**33.** September 5, 1973, was, in fact, the day Congress returned from its recess. The Secretary of the Senate was authorized, however, to receive nominations from the President during a recess of the Senate. F. Riddick, *Senate Procedure—Precedents and Practices* 561 (1974). *See also* Journal of the Senate, 93d Cong., 1st Sess. 546 (Aug. 3, 1973) ("by unanimous consent, it was ordered that the Secretary of the Senate be authorized to receive messages from the President of the United States during the adjournment of the Senate over to September 5, 1973").

**34.** The word "session" appears twice in the statute: "sixty days when the Congress is *in*

session" and "after the adjournment *sine die* of the *session of the Senate* in which such nomination was submitted." 42 U.S.C. § 2000e–4(a) (emphasis added). As the court in *Sears–Georgia* noted:

The use of the word the second time in the statute refers, we believe, to the final adjournment of one entire year–long "session" of Congress. There is no reason to think that the sixty–day "in session" period used in the first part of the statute has a different meaning and refers only to days when Congress is actually meeting.

Slip Op. at 5.

interpreting the provision. *See Sears–Georgia,* Slip Op. at 3–5; *Lewis v. Carter,* 436 F.Supp. 958, 962 n. 6 (D.D.C.1977).[35] We therefore conclude that Chairman Brown was not a *de jure* Commissioner for purposes of curing the defect in the charge. His holdover period expired on August 30, 1973, sixty days after his official term of office expired.

 The next question is whether Brown was a *de facto* Commissioner on September 11, 1973, with authority to validate the original charge. A *de facto* officer has been defined as someone

> whose title is not good in law, but who is in fact in the unobstructed possession of an office and discharging its duties in full view of the public, in such manner and under such circumstances as not to present the appearance of being an intruder or usurper.

*Waite v. Santa Cruz,* 184 U.S. 302, 323, 22 S.Ct. 327, 334, 46 L.Ed. 552 (1902). Generally, the "*de facto* officer doctrine," as it has come to be called, has been invoked to protect individuals relying on an officer's authority *and* to avoid the public disruption which would occur if technical challenges to authority were permitted. *Accord, State Dental Council and Examining Board v. Pollock,* 457 Pa. 264, 318 A.2d 910, 913 (1974) ("The *de facto* doctrine seeks to protect the public by ensuring the orderly functioning of the government despite technical defects in title to office."). *Compare* 67 C.J.S. Officers § 276, at pp. 811–814. It is the latter branch of the doctrine which concerns us here. *See e. g., Wright v. Ingold,* 445 F.2d 109, 113–114 (7th Cir. 1971) (considerations of public policy and necessity justify use of the *de facto* doctrine to overcome residency attack on Selective Service Board members); *Barrett v. Craven County Board of Education,* 70 F.R.D. 466, 482–483 (E.D.N.C.1976) (disruptive effect on the administration of school system resulting from challenge to title of school board members warrants application of the doctrine);[36] *United States v. London,* 424 F.Supp. 556, 566–567 (D.Md.1976) (*de facto* doctrine precludes challenge to residential qualifications of prosecutor).

 Sears claims that the *de facto* doctrine does not apply in the instant case because the Commission is a litigant. Cases holding the *de facto* doctrine inapplicable where a government official was a litigant have involved actions to recover personal salary, *Cottongim v. Stewart,* 283 Ky. 615, 142 S.W.2d 171 (Ct.App.1940); *Gambill v. City of Denton,* 215 S.W.2d 389 (Tex.Civ. App.1948); or special fees, *Brady v. Board of Education of Borough of Carteret,* 10 N.J.Misc. 358, 158 A. 747 (N.J.Dist.Ct.1932); or to apply the doctrine for some other kind of benefit, *Rowan v. Board of Education,* 125 W.Va. 406, 24 S.E.2d 583, 586 (Ct.App. 1943); *Mansur v. Morris,* 355 Mo. 424, 196 S.W.2d 287, 295 (Sup.Ct. *en banc* 1946); or attempts by officials to justify their questionable expenditure of public funds, *School*

---

**35.** In *Lewis v. Carter,* 436 F.Supp. 958 (D.D.C. 1977), a civil rights action brought by a former EEOC Commissioner charging unlawful termination of his position, the court specifically addressed the issue:

> Plaintiff's contention at oral argument that the sixty day period refers to legislative days and therefore should be tolled while Congress is on its recess is not supported by the wording of the statute and is without merit. 436 F.Supp. at 962, n. 6.

**36.** Sears argues that this line of cases is distinguishable because the possibility there existed for the right and title of *de facto* officers to be attacked in a direct *quo warranto* proceeding. *See e. g., Barrett v. Craven County Board of Education,* 70 F.R.D. 466, 482 (E.D.N.C.1976); *United States v. Nussbaum,* 306 F.Supp. 66, 68

(N.D.Cal.1969). Defendant argues that *quo warranto* was not available here because by the time the Commissioner's charge was served on Sears on December 3, 1973, Brown had "only a few days left at the EEOC." Defendant's Reply Memorandum, p. 34, n. 2. However, the quo warranto remedy is irrelevant to the validity of acts which the officer in question has already performed. *See Barrett v. Craven County Board of Education,* 70 F.R.D. at 483; *State Dental Council and Examining Board v. Pollock,* 457 Pa. 264, 318 A.2d 910, 913 (1974) ("*Quo warranto,* like an injunction, is addressed to preventing a continued exercise of authority unlawfully asserted rather than to correct what has already been done under that authority"). *Accord,* 74 C.J.S. Quo Warranto § 49, at 270 (1951):

*District of Kirkwood v. Zeibig,* 317 S.W.2d 295, 301 (Sup.Ct. *en banc* 1958).[37] However, Brown is not seeking to invoke the doctrine for his own personal benefit, but rather the Commission is seeking to invoke it on the behalf of the public. *Cf. General Telephone Co. of the Northwest, Inc. v. EEOC,* 446 U.S. 318, 326, 100 S.Ct. 1698, 1703, 64 L.Ed.2d 319 (1980) (Congress granted the Commission the power to bring Title VII suits to advance "the public interest as well as to bring about more effective enforcement of private rights"). Where, as here, there is no question of personal interest, we believe the *de facto* doctrine may be invoked by the officer or body whose act is in issue.

Still, before the *de facto* officer doctrine can be applied in this case, it must be established that William H. Brown, III, had color of title and discharged his duties "in full view of the public, in such manner and under such circumstances as not to present the appearance of being an intruder or usurper." *Waite v. Santa Cruz, supra,* 184 U.S. at 323, 22 S.Ct. at 334. "The mere fact that a person occupies an office does not, without more, make him a *de facto* officer." *EEOC v. Sears, Roebuck and Co.,* 79 Civ. 5708, U.S. District Court for the Southern District of New York, Memorandum Opinion (June 13, 1980) ("*Sears–New York*"), at 4.

We are unable to say that Brown himself, other government officials and the public generally had no "reasonable belief"–to apply Judge Duffy's phrase in *Sears–New York,* Slip Op. at 4–that he was entitled to exercise the powers of his office. The fact that three previous courts passing on this question have disagreed over the scope and duration of Brown's authority attests to the arguable nature of his status. *See Sears–New York,* Slip Op. at 3–4 (Brown neither a *de jure* nor *de facto* Commissioner for purposes of validating the charge); *Sears–Georgia,* Slip Op. at 6–7 (Brown is a *de facto,* but not *de jure* Commissioner); *Sears–Alabama,* 490 F.Supp. at 1252 (court assumed that Brown was a *de facto* Commissioner, but found he could not cure the defect in the charge because of

---

**37.** In arguing that the *de facto* doctrine is inapplicable here, Sears has placed principal reliance on the following quotation from Corpus Juris Secundum: "The rule [*de facto* doctrine] cannot be invoked for the advantage of the officer himself, ... or one who is chargeable with knowledge of the defect in the incumbent's title to the office." 67 C.J.S. Officers § 276, at p. 814 (1978). The cases cited in the annotations to the C.J.S. text do not support Sears' position in the instant case. A number of these personal benefit cases have been discussed in the text. *See also* the application of the *de facto* doctrine in a case where an individual is suing in his personal capacity. *United States v. Royer,* 268 U.S. 394, 398, 45 S.Ct. 519, 520, 69 L.Ed. 1011 (1925) (*de facto* doctrine applied to prevent government's recovery of overpayments received by captain while improperly serving as a major).

We also will not apply the so–called "chargeable knowledge" exception to the *de facto* doctrine, alluded to in the Corpus Juris Secundum reference. Officials in the Commission had a basis for believing that Brown was entitled to exercise the powers of his office. *See* text at 260–261. The exception has only been applied "where the defects in the title of the officer are notorious." *Oliver v. Mayor of Jersey City,* 63 N.J.L. 634, 44 A. 709, 712 (N.J.Ct. of Errors and Appeals 1899). The court in *Oliver*–the leading case articulating the exception rationale–stated a test for whether there has been "notice sufficient to warn third persons and the public" of a defect in title in a situation analogous to the instant case:

The expiration of the term of an officer, *and* appointment or election *and* qualification of his successor.

44 A. at 712 (emphasis added). Here, Mr. Powell was appointed, but not "qualified" to assume office until his Senate confirmation on December 21, 1973. We therefore believe that EEOC officials were not chargeable with knowledge of the defects in Brown's title.

Finally, it is contended that the *de facto* doctrine cannot be applied in this case because the defect in the charge is jurisdictional. See Defendant's Reply Memorandum, p. 31, n. 1; *Glidden Co. v. Zdanok,* 370 U.S. 530, 535–536, 82 S.Ct. 1459, 1464–1465, 8 L.Ed.2d 671 (1962). We have already indicated our view that verification is not jurisdictional. See note 28 *supra.*

None of the cases cited by defendant indicate that a *de facto* commissioner is subject to a higher standard of compliance with statutory requirements than a *de jure* commissioner. *Accord,* 67 C.J.S. Officers § 276, at 814 (1978) ("In order to be valid, the acts of a *de facto* officer must comply with requirements of law to the same extent and in the same manner as valid acts of *de jure* officers.").

prejudice to the defendant). The record reveals that Brown discharged his duties as EEOC Chairman openly and without challenge until late December 1973, when his successor was confirmed by the Senate. During the period between July 1, 1973, and December 23, 1973, Brown chaired Commission meetings, issued approximately 25 Commissioner charges, and submitted budgets of the Commission to the Office of Management and Budget. *See* Affidavit of William H. Brown, III (December 27, 1979) ("Brown Affidavit"), at ¶ 2. Sears does not dispute these statements.

We also note that Brown was paid the salary authorized for the position of EEOC Chairman until December 23, 1973, 5 U.S.C. § 5314(58), and that his standard government personnel forms indicate his severance from the Commission to have occurred on the same date. Brown Affidavit, ¶ 2.

For these reasons, we hold that the initially defective charge against Sears was cured by Brown's verification of the charge on September 11, 1973, in his capacity as a *de facto* Commissioner.

### 2. *Conciliation*

Sears argues that the EEOC is barred from bringing this suit because it did not conciliate in good faith. Essentially, the allegations can be reduced to two points:

(a) The EEOC insisted on negotiating solely on a nationwide basis, thus refusing to conciliate charges on the basis of individual stores;

(b) The commencement of this lawsuit on the sex discrimination charge, a narrower basis than the format for conciliation discussions,[38] indicates that the EEOC refused to negotiate in good faith.

A review of the relevant statutory language on conciliation reveals that substan-

tial discretion is vested in the Commission: The Commission should continue conciliation until such time as it is "unable to secure from the respondent a conciliation acceptable to the Commission...." 42 U.S.C. § 2000e–5(f)(1). An effort by the Senate in 1972 to require judicial review of the Commission's determinations of "acceptable" agreements was soundly rejected. 118 Cong.Rec. 3807 (Feb. 14, 1972). Such an examination of the conciliation process was deemed unworkable. *Id.* at 3807. *Accord, Sears–Georgia*, Slip Op. at 21.

■ The many cases cited by the defendant dismissing Title VII actions for failure to conciliate turn on the refusal to even "attempt conciliation," *EEOC v. Allegheny Airlines*, 436 F.Supp. 1300, 1306 (W.D.Pa.1977), or to provide an "opportunity for conciliation." *EEOC v. Westvaco Corp.*, 372 F.Supp. 985, 994 (D.Md.1974); *EEOC v. United Pipe and Foundry Co.*, 375 F.Supp. 237, 245 (N.D.Ala.1974) ("at least ... communicating with all respondents— must precede the filing of a Commission lawsuit"). "Attempt to conciliate" is the prevailing standard. *See e. g.*, *EEOC v. Pet, Inc.*, 612 F.2d 1001, 1002 (5th Cir. 1980); *EEOC v. Radiator Speciality Co.*, 610 F.2d 178, 183 (4th Cir. 1979); *EEOC v. Airguide Corp.*, 539 F.2d 1038, 1042 (5th Cir. 1976); *EEOC v. Hickey–Mitchell Co.*, 507 F.2d 944, 948 (8th Cir. 1974); *Sears–Alabama*, 490 F.Supp. at 1257; *EEOC v. Wilson and Co.*, 452 F.Supp. 202, 204–205 (W.D.Okla.1978) and cases cited therein. The sufficiency of the conciliation effort presents a question of whether the court should stay the proceeding for further conciliation, not whether it has jurisdiction over the cause. *EEOC v. Zia Company*, 582 F.2d 527, 533 (10th Cir. 1978).[39]

---

**38.** During the negotiations the Commission tied together the settlement of the sex, race and national origin discrimination claims.

**39.** The defendant has referred us to *EEOC v. Westvaco Corp.*, 372 F.Supp. 985 (D.Md.1974), to support the contention that the good faith aspect of the conciliation requirement is a jurisdictional question. The court in *EEOC v. Zia Co.*, 582 F.2d 527 (10th Cir. 1978), specifically

addressed itself to the *Westvaco* case on this point:

These courts ... sometimes speak of the defect [failure to attempt conciliation] being jurisdictional. But often they do assert continuing authority over the matter. In one

Defendant also directs our attention to the recent decisions in *Sears–Alabama* and *Sears–New York*, where two Title VII suits brought by the Commission were dismissed, *inter alia*, for the "total failure to conciliate the issues sued upon . . . ." *Sears–Alabama*, 490 F.Supp. at 1258; *Sears–New York*, Slip Op. at 4 ("absence of conciliation"). These cases, however, are clearly distinguishable from the present situation. They involved race discrimination charges at one and two Sears facilities respectively, with no conciliation occurring at all with respect to those facilities. *See Sears–Alabama*, 490 F.Supp. at 1258. In the instant case, nationwide sex discrimination charges were raised against Sears with conciliation discussions taking place on a nationwide basis. Judge Varner in the Alabama case made the following statement directly relevant to our case:

> This Court does not herein find that the EEOC failed to conciliate its nation–wide claims against Sears in "good faith" and expresses no opinion on that question. . . .

*Sears–Alabama*, 490 F.Supp. at 1258 n. 23.[40]

Finally, Sears refers us to *Marshall v. American Motors Corp.*, 475 F.Supp. 875 (E.D.Mich.1979), under the age discrimination provisions of FLSA, for the proposition that the failure to negotiate on an individual basis retroactive relief claims, such as

back pay, is a jurisdictional bar to a later government suit.[41] However, in *Marshall* the court refused to dismiss the discrimination claim, treating the negotiations issue as *not* jurisdictional. *Id.*, at 878–879.

▆ In this case, as in the *Marshall* case, there was substantial disagreement between the parties on the sticking points in the negotiations.[42] Twenty–eight meetings between the Commission and Sears took place over a 14–month period. While it might have been advisable for the EEOC to have attempted settlement on something less than a national basis, or to have separately negotiated the sex claims, we cannot say that the EEOC has not "attempted to conciliate" in satisfaction of the minimum requirements.

The Fifth Circuit Court of Appeals has recently rejected the sanction of dismissal of a Title VII suit where the Commission made only a bare attempt at conciliation. In *EEOC v. Pet, Inc.*, 612 F.2d 1001 (5th Cir. 1980), the Commission withdrew its offer to conciliate class–wide race discrimination issues when the respondent declined to consider any relief to the individual charging party. The court concluded:

> To withdraw from discussions while the other party is offering to negotiate the broad issues, merely because an impasse has occurred as to the charging party, smacks more of coercion than of concilia-

---

case failure by the EEOC to make a timely reasonable cause determination and after such determination to attempt conciliation before filing suit was held to go to whether a claim has been stated, rather than to subject matter jurisdiction. *EEOC v. Westvaco Corp.* [citation omitted].
582 F.2d at 533.

**40.** Judge Duffy in the *Sears–New York* case does not disagree with this conclusion. His decision in large part adopts the earlier opinion of Judge Varner in *Sears–Alabama*. *See Sears–New York*, Slip. Op. at 4–5.

**41.** The relevant language in *Marshall v. American Motors Corp.*, 475 F.Supp. 875 (E.D.Mich. 1979), cited at page 37 of Defendant's Reply Brief, is:
> If the Secretary seeks only prospective relief, then a period of conciliation dedicated to

generalized discriminatory practices would be adequate . . . . However, if it seeks retrospective relief, such as back pay, then it follows that there must be some discussion of the merits of *individual* cases.
475 F.Supp. at 878 (emphasis added).

**42.** We will not attempt to review the negotiations. Suffice it to say that the recollections of the parties are wholly at odds. For example, the Commission claims that the issue of back pay was the principal cause of the breakdown in the discussions, while Sears claims that virtually no talks on this subject ever occurred. *Compare* Affidavit of Aimee Gibson in Support of Plaintiff's Opposition to Defendant's Motion to Dismiss, December 29, 1979, ¶¶ 4, 8, 31 and 32 *with* Affidavit of Ray J. Graham in Support of Defendant's Motion to Dismiss, November 12, 1979, ¶ 44.

tion. Such an all–or–nothing approach [43] on the part of a commission, one of whose most essential functions is to attempt conciliation, will not do. . . . Nor will the sweeping action of the court below [dismissal of suit], a sanction far too harsh where, as here, conciliation has at least been attempted in good faith, though prematurely aborted.

612 F.2d at 1002 (citations omitted). The sanction of dismissal would be even more harsh here, where conciliation efforts have been lengthy, albeit unsuccessful.[44]

### B. *Improprieties and Abusive Practices of the Commission*

#### 1. *Conflicts of Interest*

We combine for purposes of analysis the Copus and Adams conflicts of interest asserted by Sears.[45]

Defendant relies rather heavily in its motion on cases dismissing criminal indictments for prosecutorial abuse of the grand jury process. The common fact pattern in these cases is the government attorney serving in the dual role of witness and prosecutor, impairing his ability to perform either function in an impartial way. Moreover, the fundamental secrecy of the grand jury is violated through the presence of such "unauthorized"[46] persons in the jury chamber. In such cases, a *per se* rule has been applied, requiring dismissal of the indictment. *See e. g., United States v. Treadway*, 445 F.Supp. 959, 962–963 (N.D.Tex. 1978), *citing United States v. Echols*, 542 F.2d 948, 951 (5th Cir. 1977), *cert. denied*, 431 U.S. 904, 97 S.Ct. 1695, 52 L.Ed.2d 387.

While the grand jury, like the EEOC, is essentially an investigative body, wholly different historical and constitutional considerations are involved. The harsh rule of

**43.** In *EEOC v. Pet, Inc.*, 612 F.2d 1001 (5th Cir. 1980), the Commission pursued conciliation discussions on an individual basis, while in the Sears investigation negotiations were principally–if not exclusively–undertaken on a nationwide basis.

**44.** In *EEOC v. Pet, Inc., supra*, the Fifth Circuit Court of Appeals remanded the case to the district court for the entry of a limited stay to provide for additional conciliation. We are mindful of our power to stay proceedings to provide for further conciliation. 42 U.S.C. § 2000e–5(f)(1). However, our discussions with the parties have made it clear that further efforts at conciliation would be fruitless.

**45.** We are not persuaded by the Commission argument that Sears has waived its assertion of the conflicts of interest point. Sears raised the claim on its petition for reconsideration of the Commission's decision, which may have been the "earliest moment" in time after its knowledge of the facts. *Cf. United States v. Patrick*, 542 F.2d 381, 390 (7th Cir. 1976) (disqualification of judge untimely), *cert. denied*, 430 U.S. 931, 97 S.Ct. 1551, 51 L.Ed.2d 775. Moreover, for purposes of our "worst case" analysis, we want to examine the point on its merits.

Although Sears charges that several other employees of the Commission were simultaneously affiliated with NOW, Defendant's *Evidence Obtained Through Limited Discovery*, July 16, 1980, pp. 10–12, Defendant's Offer of Proof, July 16, 1980, pp. 7–8, our discussion will focus on Copus and Adams. The allegations against them are more serious. In addition, these other EEOC employees were primar-

ily responsible for the processing of the individual charges, which we have rejected as an alternative jurisdictional basis for this suit. *See* note 9, *supra*. Moreover, a doubt has been raised about the relevance of these employees' ties with NOW. In opposing a stay of discovery, Sears explained the necessity of proceeding with the depositions of certain key individuals and made the following statement:

Kathleen Kundar, who has advised Sears Counsel that she is *now* a member of NOW and is the former EEOC employee who, under the supervision of former EEOC Assistant General Counsel Capello, drafted the memoranda which . . . Ms. Capello and, ultimately, EEOC General Counsel Carey, based their recommendations that a Commissioner's Charge be filed against Sears.

Defendant's Opposition to Stay of Discovery, August 11, 1980, p. 9 (emphasis added). If Kundar did not become a member of NOW until after leaving the Commission, her membership is irrelevant. Nonetheless, we emphasize that in ruling on the conflicts of interest of Copus and Adams we have kept in mind the allegations against these other individuals and the possible collective effect such allegiances, if proved, would have.

**46.** If a witness remains in the grand jury room because of his dual role as a prosecuting attorney, while another witness testified, he is an "unauthorized" person under Federal Rule of Criminal Procedure 6(d). *United States v. Braniff Airways, Inc.*, 428 F.Supp. 579, 589 (W.D.Tex.1977).

dismissal in the criminal area, even absent any showing of prejudice, is bound up with the liberty interest and the Fifth Amendment prohibition against holding a person to answer for a "capital, or otherwise infamous crime" unless upon the presentment of a grand jury.

*United States v. Gold*, 470 F.Supp. 1336 (N.D.Ill.1979), an indictment dismissal case cited by the defendant, sheds further light on the "deeply ingrained" principles underlying the grand jury process:

> 'The grand jury exists as an integral part of Anglo–American jurisprudence for the express purpose of assuring that persons will not be charged with crimes simply because of the zeal, malice, partiality or other prejudice of the prosecutor, the government or private persons.'

470 F.Supp. at 1346, *citing United States v. DiGrazia*, 213 F.Supp. 232, 235 (N.D.Ill. 1963).

No *per se* rule of dismissal, however, has been applied on the civil side for apparent conflicts of interest. *Compare Sears–Georgia*, Slip Op. at 16 (passing references in cases to EEOC "prosecution[s]" neither implies nor proves that criminal standards of prosecutorial misconduct should be applied in civil setting); *Wellman v. Dickinson*, 79 F.R.D. 341, 350–351 (S.D.N.Y.1978) (tainted civil investigation not to be evaluated by reference to cases dismissing criminal indictments). No case, in fact, dealt with the appearance of impropriety as a sufficient ground to warrant dismissal of a Title VII claim. *Cf. EEOC v. First National Bank of Jackson*, 614 F.2d 1004 (5th Cir. 1980) (misconduct rising to level of malicious prosecution and harassment does not state an affirmative defense to Title VII claim). *Accord, Sears–Alabama*, 490 F.Supp. at 1254.

*Air Transport Association of America v. Hernandez*, 264 F.Supp. 227 (D.D.C.1967), the closest case cited by the defendant, is clearly distinguishable from the instant action. In *Hernandez* the court passed on the question whether the EEOC could issue an interpretative ruling voted on by an interested Commissioner.[47] In no sense was the court's refusal to approve the issuance of the ruling akin to the sanction of dismissal. The court noted:

> This opinion has no conclusive effect on the Commission. It may, in its discretion, rehear the issue or refuse to issue an interpretative ruling as requested by the Airlines.

264 F.Supp. at 232. Moreover, while the administrative ruling in *Hernandez* had "the effect of law," *id.* at 229, the findings of the Commission in the Sears investigation are not binding in any respect. It is for this court, not the Commission, to determine whether Sears discriminated against its employees.

Generally, courts have held with respect to administrative agency investigations that "[w]hat is crucial to the validity of a decision is the actual bias on the person who makes the decision." *Do–Right Auto Sales v. Howlett*, 401 F.Supp. 1035, 1039 (N.D.Ill. 1975); *American Cynamid Company v. FTC*, 363 F.2d 757, 764 (6th Cir. 1966). *Cf. Hortonville Joint School District No. 1 v. Hortonville Education Association*, 426 U.S. 482, 491, 96 S.Ct. 2308, 2313, 49 L.Ed.2d 1 (1976).

■■■ Actual bias may exist in the form of a personal or philosophical predilection on an issue or as a result of a pecuniary interest. On the philosophical level, even if it could be established that Copus and Adams were favorably disposed toward NOW–related charges before the Commission, the precedents do not support dismissal of the Title VII claims *to be adjudicated for the first time* in a federal district court. Rather, they involve the disqualification of agen-

---

**47.** The specific facts in *Air Transportation of America v. Hernandez*, 264 F.Supp. 227 (D.D.C.1967) were as follows: EEOC Commissioner Hernandez refused to. disqualify herself from voting on an interpretative ruling on the eve of her departure for a high level position at NOW, an organization which had taken an af-firmative position on the very issue before the Commission. The issue concerned whether sex was a bona fide occupational qualification for the position of air line cabin attendants. Along with the distinctions highlighted in the text, Copus and Adams were not sitting commissioners.

cy officials, *e.g., American General Insurance Co. v. Federal Trade Commission*, 589 F.2d 462 (9th Cir. 1979) (FTC Commissioner), *Cinderella Career and Finishing Schools, Inc. v. Federal Trade Commission*, 425 F.2d 583, 589 *et seq.* (D.C.Cir. 1970) (FTC Commissioner); and the refusal thereafter to enforce agency action, *NLRB v. Autotronics*, 596 F.2d 322 (8th Cir. 1979); *American Cynamid Co. v. Federal Trade Commission*, 363 F.2d 757 (6th Cir. 1966). *Contra, Pillsbury Co. v. FTC*, 354 F.2d 952, 965 (5th Cir. 1966) (disqualification of commissioners is not intended to nullify all agency action but to guarantee a fair tribunal).

Cases involving conflicts of interest in a prior adjudication are inapposite, since the EEOC is vested solely with investigative powers. *Compare Sears–Georgia*, Slip Op. at 14 (finding no due process deprivation flowing from Copus' conflicts of interest).[48] The Supreme Court in *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980), expressly stated that

> the strict requirements of neutrality cannot be the same for administrative prosecutors [or civil plaintiffs] *as for judges, whose duty it is to make the final decision and whose impartiality serves as the ultimate guarantee of a fair and meaningful proceeding in our constitutional regime.*

446 U.S. at 250, 100 S.Ct. at 1617 (emphasis added). The function of an assistant regional administrator of the Department of Labor in *Jerrico* –labeled an "administrative prosecutor"–was recognized to be "akin to that of a ... civil plaintiff." *Id.*, at 247, 100 S.Ct. at 1615; acting, in essence, as a "complaining party." *Id. See* further discussion of *Jerrico* case in note 21 *supra.*

Similarly, conflicts of interest involving sitting commissioners of regulatory agencies are to be distinguished from those involving staff advisers of the agencies. *See Starr v. Federal Aviation Administration*, 589 F.2d 307 (7th Cir. 1978) (prejudgment of Air Surgeon, an influential staff adviser, in strongly opposing relaxation of Age 60 rule for pilots and discouraging filing of the instant suit does not require his disqualification or the nonenforcement of agency's denial of exemption).[49]

In addition, there is a body of authority indicating that mere philosophical or political leanings are not a cause for disqualification, much less the dismissal of unadjudicated substantive claims. *See Skokie Federal Savings and Loan Association v. Federal Home Loan Bank Board*, 400 F.Supp. 1016, 1019 (N.D.Ill.1975); *Skelly Oil Co. v. Federal Power Commission*, 375 F.2d 6, 17–18 (10th Cir. 1967), *aff'd in part, rev'd in part on other grounds, sub nom. Permian Basin Area Rate Cases*, 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). *See also Keating v. Federal Aviation Administration*, 610 F.2d 611, 614 (9th Cir. 1979) ("[m]embers of a regulatory agency need not be disqualified for forming views about general principles of law and policy. . . ."); *American Cyanamid Co. v. FTC*, 363 F.2d 757, 764 (6th

---

**48.** "The only deprivation flowing from the conflicts of interest claimed by Sears is a loss of "property" in the expense incurred in retaining legal counsel to represent defendant for the duration of the EEOC investigation, negotiations, and subsequent suit. Defendant does not cite, and we have not found, any authority holding that incurring expense by hiring counsel, complying with an investigation, negotiating with a government agency, or defending against a suit, whether done voluntarily or involuntarily, constitutes a denial of liberty or property invoking due process. The EEOC has enforced no rule against Sears, withdrawn no benefits, and affected no rights to defendant through the alleged conflicts of interest of some of its employees." *Sears–Georgia*, Slip Op. at 14.

**49.** "There can be no doubt that courts have insisted and will insist on absence of partiality or even the appearance of it by those exercising *quasi–judicial functions, or authorized to form conclusions of fact or law upon written records.*" *Starr v. Federal Aviation Administration*, 589 F.2d 307, 315 (7th Cir. 1978) (emphasis added). While the Seventh Circuit in *Starr* noted "the possibility that acute enough and improper enough bias in an active enough staff adviser *might infest the entire decision of the agency,*" *id.* at 315, the case it cited to illustrate and support this principle involved *pecuniary* interest of a part–time governmental consultant. *See United States v. Mississippi Valley Co.*, 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961).

Cir. 1966) ("strong conviction" and "crystallized point of view" not grounds for disqualification).

■ With respect to pecuniary bias, we do not find, applying our "worst case" analysis, any reasonable [50] indication of such bias on the part of the Commission,[51] or more particularly Copus, in the Sears investigation. To say that because NOW may have a pecuniary stake in the outcome of the Sears case,[52] that Copus is to be infused with a pecuniary interest, as Sears argues, is a *non sequitur.* Nor are we persuaded by Sears' contention that the duty of a board member to a nonprofit corporation automatically "deputize[s]" such person to obtain fee–generating litigation for the corporation. (Defendant's Memorandum and Offer of Proof, February 1, 1980, p. 3, n. 1).

We regard as relatively trivial the matter of Copus' and Adams' alleged conjugal relationship. Sears alleges upon information and belief that they were seen together as early as 1973 and were observed "walking in the halls ... together" during Ms. Adams brief tenure at the Commission.[53] Defendant's Offer of Evidence Obtained Through Limited Discovery, July 16, 1980, p. 10, quoting deposition of Janet DeVries. Having found no indication of actual bias [54] on the part of these individuals–either in their capacity as staff members of an investigative agency or through their affiliation with NOW–related organizations–we regard evidence of their living arrangement as merely cumulative on the point of any appearance of impropriety.[55]

**50.** Ms. Adams' circulation of a proposal to establish a litigation project for NOW during her employment for the Commission (Sears Chronology, Feb. 22, 1980, Tab B, p. 6), while showing disregard for public perceptions of the agency, cannot be said to have triggered any personal pecuniary interest on her part in "the fortunes of NOW." Defendant's Memorandum and Offer of Proof, Feb. 1, 1980, p. 4. We note additionally that Adams left the Commission approximately 1–2 months after the circulation of the proposal (Adams Affidavit, ¶ 5) and had no direct or active involvement in any phase of the Sears matter during her tenure there. *See* text at p. 247 *supra* and note 8 *supra.*

**51.** Sears argues that the EEOC indirectly funded two private litigants (Ms. Carolyn Hendrock and Ms. Donna Walker) in their intervention in a suit by Sears to enjoin the dissemination of the Commission's data from its investigation, *Sears, Roebuck and Co. v. EEOC,* 435 F.Supp. 751 (D.D.C.1977), *aff'd in part and rev'd in part,* 581 F.2d 941 (D.C.Cir.1978). *See* Graham Affidavit, ¶ 73. EEOC did provide funding to the Cleveland–Marshall College of Law for purposes of "litigation enforcement of Title VII with primary emphasis on sex discrimination," and the Cleveland–Marshall project, in turn, provided the attorneys to represent Ms. Hendrock and Ms. Walker in this litigation. We do not see, however, how the Commission could have monetarily benefited from this situation. Nor do we find that such indirect funding of this type raises the specter of actual bias in this case. The danger exists that the Commission might utilize the private bar to circumvent the statutory requirements and limitations on its own action. We have found in this case, however, that the Commission has satisfied the statutory prerequisites to suit.

**52.** The financial interest of NOW in the Sears probe is said to be shown in a November 1974 mailing to various NOW officials from the "Sears Subcommittee" of NOW:

> Because of the important issues that this campaign raises for women and for NOW's future work, and because of its potential to build the strength of the organization, putting the pressure Sears [sic] *NOW,* can gain a major win for women! We urge you to join the campaign against Sears if your chapter has not already done so.

Graham Affidavit in Support of Defendant's Motion to Dismiss, Exhibit C–3, at F–7 (emphasis in the original).

**53.** We are not aided in this analysis by Sears' observations that cohabitation is "not ... socially acceptable" and "a breeding ground for surreptitious actions and perjury." Defendant's Memorandum of Points and Authorities on Selected Issues of Law, February 1, 1980, pp. 14–15.

**54.** As we have done previously in this analysis, we distinguish between actual bias and philosophical or ideological leanings devoid of any pecuniary interest; the latter conduct does not generally require the disqualification of even adjudicating commissioners. *See* discussion at pp. 265–267 *supra.*

**55.** Admittedly, a government attorney owes a high ethical duty to the public and courts have found conflicts of interest to spring from spousal involvement in the same matter, *see e. g., Pashek v. Arizona Board of Regents,* 82 F.R.D. 62, 63 (D.Ariz.1979). These ethical violations have been found where the lawyer–spouses di-

We reaffirm our conclusion that any cloud over the Commission's investigation of Sears can be removed through a trial *de novo* of the substantive issues in this proceeding. As indicated above, we may give such weight to the record and findings of the Commission as we deem appropriate. Instructive on the point of the weight and admissibility of the administrative record is the Supreme Court's decision in *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). The Court held in *Alexander* that an employee's right to a trial *de novo* under Title VII is not foreclosed by the prior submission of the discrimination claim to final arbitration under the nondiscrimination clause of a collective bargaining agreement. The following factors were thought relevant in the appraisal of the record below: "the degree of procedural fairness," "the special competence" of the arbitrators (or in our case, factfinders), "the adequacy of the record with respect to the issue of discrimination." 415 U.S. at 60, n. 21, 94 S.Ct. at 1025, n. 21. Ultimately, however, it was noted that the weight to be accorded to the administrative record "must be determined in the court's discretion *with regard to the facts and circumstances of each case.*" *Id.* (emphasis added). Obviously, the activities of Copus and Adams constitute such "circumstances" which can be taken into account here in connection with any consideration given the administrative record.

## 2. Publicity

■ Sears alleges that the EEOC leaked copies of the Commission's decision 77–21 to private interest groups and otherwise en-

gaged in a media harassment campaign against Sears. Sears did file suit to enjoin dissemination of "confidential" investigatory data of the Commission and the Commission's decision, and the District of Columbia federal courts upheld Sears' claim.[56] However, taking defendant's allegations as true, we believe that any injury to reputation or goodwill resulting from the leaks fails to reach constitutional proportions. Sears contends that it has a "substantial property interest in its good name." Defendant's Brief in Support, p. 26. However, the Supreme Court expressly rejected the notion in *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), that every defamation by a governmental body triggers the protections of the Due Process Clause:

> While we have in a number of our prior cases pointed out the frequently drastic effect of the "stigma" which may result from defamation by the government in a variety of contexts, this line of cases does not establish the proposition that reputation alone, apart from some more tangible interests such as employment, is either "liberty" or "property" by itself sufficient to invoke the procedural protection of the Due Process Clause.[57]

424 U.S. at 701, 96 S.Ct. at 1160–1161; *Elbert v. Board of Education of Lanark Community Unit School District*, 630 F.2d 509 at 513 (7th Cir. 1980) (defamation alone does not trigger due process protection).

■ The Seventh Circuit in the aftermath of *Paul v. Davis* has formulated a "stigma-plus" test, *Colaizzi v. Walker*, 542 F.2d 969, 973 (7th Cir. 1976), cert. denied, 430 U.S. 960, 97 S.Ct. 1610, 51 L.Ed.2d 811; *Austin v. Board of Education of George-*

---

rectly and actively represented conflicting interests in the same controversy. *See* ABA Formal Opinion 340 (Sept. 23, 1975). In this case, Adams did not have a significant role in the Sears investigation either during her brief tenure at the Commission, note 8 *supra*, or in her activities on behalf of NOW and the NOW–related complainants. *See also* discussion at p. 268 *infra*, on the weight to be given to the record and findings of the Commission, including the degree of procedural fairness *or* unfairness attaching to the Commission's investigation.

56. *Sears, Roebuck and Co. v. EEOC*, 435 F.Supp. 751 (D.D.C.1977), *aff'd in part and rev'd in part*, 581 F.2d 941 (D.C. Cir. 1978).

57. While *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), dealt with defamation by a state official under the Fourteenth Amendment, the Supreme Court specifically noted that the same standard and analysis would apply to federal officials under the Fifth Amendment. 424 U.S. at 702, n. 3, 96 S.Ct. at 1161, n. 3.

*town*, 562 F.2d 446, 450 (7th Cir. 1977); *Elbert v. Board of Education, supra,* at 512: In order to establish a liberty or property interest sufficient to implicate Fourteenth Amendment safeguards, the individual must not only be stigmatized, but stigmatized in connection with the denial of a right or status previously recognized under state law. *Colaizzi v. Walker, supra,* 542 F.2d at 973. *Accord, Moore v. Otero,* 557 F.2d 435, 437 (5th Cir. 1977). In *Colaizzi,* the Seventh Circuit stated that the infliction of a stigma to reputation accompanied by a failure to rehire or, *a fortiori,* by a discharge, states a claim for deprivation of liberty without due process. 542 F.2d at 973. Other circuits have followed the lead of the Seventh Circuit in applying a "stigma-plus" test. *See e. g., Dennis v. S & S Consolidated Rural High School District,* 577 F.2d 338, 341 (5th Cir. 1978); *McGhee v. Draper,* 564 F.2d 902, 910 (10th Cir. 1977). *See also Poirier v. Hodges,* 445 F.Supp. 838, 842–844 (M.D.Fla.1978) (applying stigma-plus test in finding no due process injury to business reputation).

In the instant case, Sears has only shown some unfortunate publicity generated by a purely investigatory agency. *Accord, Sears–Georgia,* Slip Op. at 18. It has not cited any "plus" factor or tangible harm that directly resulted from the publicity. For example, it does not allege any decrease in sales occasioned by the disclosures. We do not find anything akin to the loss of a state-conferred right of adults to purchase liquor in *Wisconsin v. Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971),[58] a suspension from public school in *Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975), or a failure to rehire or a discharge of employment as in *Colaizzi v. Walker, supra,* and *Dennis v. S & S Consolidated Rural High School District, supra.* Sears does allege some general loss of goodwill, but this is highly speculative and certainly does not constitute the sort of "tangible interest" adverted to in *Paul v. Davis, supra,* 424 U.S. at 701, 96 S.Ct. at 1160.

Moreover, the "right to engage in conciliation discussions" and the "right to confidentiality," Defendant's Brief in Support, p. 26 n. 2, do not involve due process considerations. Sears was not denied the opportunity to conciliate. At most, it was deprived of conciliation discussions unfettered by earlier adverse publicity. Since the Commission's investigative findings have no determinate consequences, we cannot say that any loss or judgment of "guilt," Defendant's Brief in Support, p. 20, has attached to the reasonable cause determination.

■ Any alleged infractions of the Commission's confidentiality rules, 42 U.S.C. §§ 2000e–5(b), 2000e–8(e),[59] also fail to

---

**58.** Sears relies heavily on certain language appearing in *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 510, 27 L.Ed.2d 515 (1971), to support a violation of due process in the instant case:

> Where a person's name, reputation, honor, or integrity is at stake because of what the government is doing to him, notice and an opportunity to be heard is essential.

The Supreme Court, however, interpreted and clarified that statement in the later case of *Paul v. Davis,* 424 U.S. 693, 708, 96 S.Ct. 1155, 1164, 47 L.Ed.2d 405 (1976):

> We think the italicized language in the last sentence quoted, "because of what the government is doing to him," referred to the fact that the governmental action taken in that case [*Wisconsin v. Constantineau*] deprived the individual of a right previously held under state law—the right to purchase or obtain liquor in common with the rest of the citizenry.

It was thus the denial of a liberty interest coupled with scandalous and defamatory public disclosure that triggered the due process violation in *Wisconsin v. Constantineau.*

**59.** 42 U.S.C. § 2000e–5(b) states in pertinent part:

> Nothing said or done during and as a part of [the processing of the charge and informal endeavors at conciliation] . . . may be made public by the Commission, its officers or employees, or used as evidence in a subsequent proceeding without the written consent of the persons concerned. Any person who makes public information in violation of this subsection shall be fined not more than $1,000 or imprisoned for not more than one year, or both.

42 U.S.C. § 2000e–8(e) provides:

> It shall be unlawful for any officer or employee of the Commission to make public in any manner whatever any information obtained by the Commission pursuant to its authority under this section prior to the institution of

reach the level of a due process violation. *Accord, Sears–Georgia*, Slip Op. at 19, "The disclosures claimed here resulted in uncomfortable publicity for defendant, not in denial of due process." The statutory failure here is not even directed to the core of the due process guarantee: notice and opportunity to be heard. *See, e. g., EEOC v. Bailey Co., Inc.*, 563 F.2d 439, 450 (6th Cir. 1977) (failure of Commission to notify employer of the scope of and basis for its investigation), *cert. denied*, 435 U.S. 915, 98 S.Ct. 1468, 55 L.Ed.2d 506. Sears is not alleging the denial of a hearing right or even damages flowing from the disclosure. Instead, apparently basing its argument on a theory of deterrence, Sears would have us dismiss the instant Title VII suit without any adjudication on the merits. There is no justification for such drastic relief. Congress has provided a specific deterrent—criminal prosecution—of those responsible for the leaks.[60] If, in fact, the Commission authorized or knew of the "leaks" of the Commission report, these transgressions will not affect the ability of this court to make a fair and impartial determination of the merits.

We note in this connection the decision in *EEOC v. Red Arrow Corp.*, 392 F.Supp. 64 (E.D.Mo.1974), where, in preparation for trial, the EEOC placed ads in several newspapers to solicit victims of racially discriminatory hiring practices of the defendant. The court refused to dismiss the discrimination suit brought by the Commission because of "the possible adverse effects upon the real parties in interest." *Id.*, at 64. The court characterized the sanction of dismissal as "severe." *Id.*, at 64.[61]

### 3. Bill of Attainder

■ Sears alleges that the EEOC's use of adverse publicity inflicted punishment on

any proceeding under this subchapter involving such information. Any officer or employee of the Commission who shall make public in any manner whatever any information in violation of this subsection shall be guilty of a misdemeanor and upon conviction thereof, shall be fined not more than $1,000, or imprisoned not more than one year.

Sears without judicial trial, contravening the Bill of Attainder Clause of the United States Constitution, art. I, § 9, cl. 3. Little attention needs to be directed to this argument, as we find it inappropriate to the setting in which the Commission operates.

The Bill of Attainder Clause was intended, as the Supreme Court declared in *United States v. Brown*, 381 U.S. 437, 442, 85 S.Ct. 1707, 1711, 14 L.Ed.2d 484 (1965), to serve as "a general safeguard against legislative exercise of the judicial function, or more simply—trial by legislature...." We do not find the EEOC's responsibilities in the Title VII area to be "legislative" or "judicial" in character. *See* discussion of the purely investigatory powers of the Commission, pp. 254–255 *supra*. There has been no determination of Sears' guilt by the Commission, nor the imposition of any punitive measures. Sears has merely been the subject of a Title VII sex discrimination investigation and named as a defendant in a civil suit brought by a governmental agency. Thus, no punishment has been "inflicted ... within the constitutional proscription against bills of attainder." *Nixon v. Administrator of General Services*, 433 U.S. 425, 472–473, 97 S.Ct. 2777, 2805, 53 L.Ed.2d 867 (1977). *Accord, Sears–Georgia*, Slip Op. at 20 ("branding" effect resulting from improper press disclosures does not amount to a constitutional violation).

### 4. Denial of Hearing on Reconsideration of Commission's Decision 77–21

The Commission's summary refusal to grant Sears a hearing on its reasonable cause determination is said to violate principles of due process. Defendant requested the Commission to set aside its decision and "proceed upon a record untainted by conflicts of interest." Defendant's Memorandum in Support, p. 44.

**60.** See note 59, *supra*.

**61.** The solicited evidence was ruled inadmissible and the court warned that any repetition of this conduct would be grounds for "immediate dismissal." *EEOC v. Red Arrow*, 392 F.Supp. at 64.

 While we agree with defendant that the Commission's handling of the Copus conflict was improper,[62] we do not believe the impropriety reached due process proportions. Due process does not guarantee such a hearing where the findings of the Commission are not adjudicative. In *Georator Corp. v. EEOC*, 592 F.2d 765 (4th Cir. 1979), the court found no due process violation in the failure to give plaintiff an opportunity to be heard prior to the Commission's issuance of its reasonable cause determination. The Court emphasized that this determination had "no effect until the Commission or the charging party brings suit in district court. Georator will have an opportunity at that time to be heard and defend against the charges." 592 F.2d at 769 (citations omitted). *See SEC v. OKC Corp.*, 474 F.Supp. 1031, 1041 (N.D.Tex. 1979) (no due process violations result from SEC "accusatory" proceeding, "no determinate consequences" flow therefrom). *Accord, Hannah v. Larche*, 363 U.S. 420, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960) (Commission on Civil Rights' procedural rules denying subject right to be apprised of specific charges, identities of accusers, right to confront and cross–examine witnesses held not to violate Due Process Clause of the Fifth Amendment where Commission acts solely as an investigatory and fact–finding agency). *See also Wellman v. Dickinson*, 79 F.R.D. 341, 352 (S.D.N.Y.1978) (dismissal of government suit not appropriate where the SEC, a Commission with no adjudicative powers, did not afford petitioners an opportunity to press their claims prior to litigation).

### 5. Commission's Violation of its Own Regulations

 Sears argues that the Commission in its investigation violated EEOC conflict of interest regulations, and thereby denied it due process. *See* text of regulations at n. 14 *supra*. We reject these contentions, applying the analysis from the preceding section: Sears will have a full and fair opportunity to present its substantive position to this court in a trial on the merits. "It must be remembered that all that is in issue here is the institution of suit by the government against the Defendant, not the substantive adjudication of [its] rights." *Wellman v. Dickinson*, 79 F.R.D. 341, 352 (S.D.N.Y. 1978). It is this very element of a full trial on the merits which renders cases cited by the defendant, such as *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), inapposite. As the court in *Wellman v. Dickinson* explained:

> In *Accardi*, for example, the allegation was that the Board of Immigration Appeals violated its own regulations by failing to exercise its discretion in reaching a determination in a deportation proceeding because the Board simply relied on a list of "undesirables" tendered to it by the Attorney General. There, ... the petitioner did not have the protection of a full trial at the end of the plenary procedure.

79 F.R.D. at 353.

We conclude that any breach of the conflicts regulations by Copus and Adams does not require dismissal of the cause of action.

### C. Res Judicata on Equal Pay Claims

Finally, it is contended that the adjudication of a nationwide injunction under the equal pay provisions of the Fair Labor Standards Act, 29 U.S.C. § 206(d), in *Usery v. Sears, Roebuck and Co.*, 421 F.Supp. 411 (N.D.Iowa 1976) ("*Usery*"), supplementing *Brennan v. Sears, Roebuck and Co.*, 410 F.Supp. 84 (N.D.Iowa 1976) ("*Brennan*"), bars the assertion of such a claim in this court. Additionally, it is argued that this earlier adjudication is a bar to a monetary back pay claim under the FLSA and to injunctive and monetary relief under the equal pay provisions of Title VII. In response, the EEOC principally states that the equal pay claims being asserted in the instant action have arisen after the judgments in *Usery*, rendering the principles of res judicata and collateral estoppel irrele-

---

**62.** *See* earlier discussion at pp. 250–251 *supra*.

vant.[63] The Commission also contests the scope of the *Usery* holding denying the Department of Labor a nationwide equal pay injunction.

Specifically, the Iowa federal district court held in *Brennan* that there were equal pay violations regarding sales persons and division managers at the Fort Dodge Sears store prior to 1972. 410 F.Supp. at 101. The record did not support a finding of any present violations or the risk of a future violation of the equal pay provisions at this Sears facility or at any other Sears facility. 410 F.Supp. at 101–102; 421 F.Supp. at 414–415. Therefore, the court in *Usery* refused to grant any nationwide equal pay injunction against Sears. 421 F.Supp. at 414–415.

We note initially that principles of res judicata and collateral estoppel apply to governmental agencies as well as to private parties, *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 402–403, 60 S.Ct. 907, 916–917, 84 L.Ed. 1263 (1940), and that the Department of Labor is in privity with the EEOC for purposes of these prior adjudication doctrines. *Id.* at 402–403, 60 S.Ct. at 916–917.

The line where the doctrine of res judicata ends and the doctrine of collateral estoppel begins is clouded. The Supreme Court has proceeded on the assumption that whereas res judicata "forecloses all that which might have been litigated previously, collateral estoppel treats as final only those questions actually and necessarily decided in a prior suit." *Brown v. Felsen*, 442 U.S. 127, 139 n.10, 99 S.Ct. 2205, 2213, 60 L.Ed.2d 767 (1979).

We believe that under either the "could have been litigated" or the "actually and necessarily litigated" standard it would be improper to preclude litigation of the equal pay claims in the instant case. Central to both the res judicata and collateral doctrines is the concept of a "full and fair opportunity to litigate." *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979); *Speaker Sortation Systems v. U. S. Postal Service*, 568 F.2d 46, 48–49 (7th Cir. 1978); *Butler v. Stover Bros. Trucking Co.*, 546 F.2d 544, 551 (7th Cir. 1977). A careful examination of the record and pleadings in the Iowa litigation reveals considerable confusion about the presentation of evidence on the scope of an equal pay injunction.

It is necessary to relate in some detail the events and decisions in the *Brennan* and *Usery* litigation leading to the confusion:

(1) The Department of Labor requested the production of documents to establish the likelihood of violations of the Equal Pay provisions at other Sears facilities and to prepare the groundwork for broad injunctive relief. See Plaintiff's Second Motion for Order Compelling Answers to Deposition Questions (dated October 30, 1973), reprinted as Exhibit A to Equal Pay Affidavit of Ray J. Graham Filed in Support of Defendant's Motion to Dismiss ("Graham Affidavit Exhibits"), at pp. 5–6. In granting such discovery, Magistrate Hodges on December 21, 1973, noted that the information and material sought was directed to the "scope of any injunctive relief." Magistrate Order of Dec. 21, 1973, reprinted as Exhibit D to Graham Affidavit, at pp. 2–3.

(2) On March 14, 1974, Magistrate Hodges separated for trial the issues of liability and relief, including any possible injunction. Specifically, he observed that "only the issue of liability—whether there has been a violation of the Fair Labor Standards Act will be tried on March 25, 1974. The question of the amount of back pay and the scope of injunctive relief if any will be reserved pending a determination of liability." Quoted in Graham Affidavit Exhibit C, at p. 6.

---

**63.** Although we reach the conclusion that the various equal pay claims are not barred, we reject this argument of the plaintiff. We are not persuaded that more recent equal pay claims, though identical to those adjudicated in an earlier suit, are not subject to res judicata or collateral estoppel defenses. We agree with the defendant that the cases cited by the Commission are distinguishable from the instant factual situation. *See, e. g., Lawlor v. National Screen Service Corp.*, 349 U.S. 322, 328, 75 S.Ct. 865, 868, 99 L.Ed. 1122 (1955) (decision to permit second suit largely based on changed circumstances).

(3) Plaintiff Department of Labor moved for reconsideration of this order because it believed the issues of liability and remedy were too intertwined and confusing to permit ready separation. *See* Graham Affidavit Exhibit C, at p. 7. The motion was denied by federal district court Judge Hanson on May 17, 1974. *Id.* at 7.

(4) Plaintiff filed a post-trial motion to amend its complaint to conform to the evidence presented. The motion is characterized as a motion to "enlarge" by the court, seeking to give the suit a nationwide scope by inferring similar violations at other Sears facilities. In denying the motion, Judge Hanson made the following comments:

> The scope of this case at the present time deals with liability at the Fort Dodge store. *If* liability is established, and *if* that liability is based on an aspect of a nationwide plan, at that point the scope of this case might be enlarged.
>
> . . . The matters plaintiff attempts to inject here [evidence and inferences of equal pay violations at other Sears stores] are more properly related to the issue of remedy, and will be considered at that time, if that time ever comes.

November 14, 1974, Order, reprinted in Graham Affidavit Exhibit E at pp. 1–2 (emphasis in original).

(5) Trial court ruling, 410 F.Supp. 84 (N.D.Iowa 1976), is handed down, finding equal pay violations at the one Iowa facility prior to 1972. "The record does not support a finding of any present or future violations of the [Equal Pay] Act in any other Sears store." 410 F.Supp. at 101. The court requests "written suggestions" from the parties as to "the need, if any, for further remedy-related proceedings in this cause." *Id.* at 102.

(6) Plaintiff files Motion for Injunctive Relief and for Further Remedy-Related Proceedings (undated). Reprinted in Graham Affidavit Exhibit C, at pp. 1–11. A hearing is requested "concerning the Secretary's [of Labor] need for broader relief." *Id.* at 1. It is argued that any "deficiencies in the present record" are "directly attrib-

utable" to the government's understanding of the preliminary rulings by the magistrate and court (*Id.* at 7):

> Plaintiff's attorneys understood these orders to preclude us from introducing at trial or briefing in the post-trial brief any evidence which was relevant solely to the scope of the injunction. (Thus, plaintiff's post-trial brief, like defendant's, nowhere discusses the issue of back pay or injunctive relief.) For this reason, the sole proof which we adduced at trial with respect to the institution by Sears' national management of the Affirmative Action Plan concerned the impact of the implementation of that plan on pay practices at the Fort Dodge store. We did not seek to introduce the proof available to show that, because of similar patterns of discriminatory job grade placement of females and males discovered at other stores in the course of several pending Wage-Hour investigations, the Affirmative Action Plan was causing or was likely to cause Equal Pay violations at those stores as well.

(7) Judge Hanson issued his ruling denying, *inter alia*, the nationwide equal pay injunction against Sears. 421 F.Supp. 411 (Sept. 29, 1976, as modified Nov. 15, 1976). Three key passages are: "The time has long since passed for proof of liability, and no post-1972 violations have ever been established." *Id.* at 414. "If plaintiff wished to prove violations at other stores, it should have amended its complaint and done so directly during the liability trial." *Id.* at 414. "At present the Court discerns no risk for a future violation, either at Fort Dodge or anywhere else, and in light of the limited offer of proof tendered by the plaintiff, concludes that a further hearing is unnecessary, and that no injunctive relief is appropriate." *Id.* at 414–415.

 The plaintiff did not have a proper opportunity to fully and fairly litigate the basis for a nationwide equal pay injunction in the Iowa forum. At the very least, it can be said that the government was not on notice that it was to present evidence of these nationwide violations during the lia-

bility phase. The Magistrate's initial rulings, in particular, support this conclusion. Substantial confusion resulted from his interpretation of the phrase "scope of any injunctive relief." It may have been wise, in retrospect, for the government to have presented evidence of discriminatory practices at other Sears stores during the liability phase to preserve its options. However, not having done so, we do not believe that the government should be barred from properly litigating these matters in this suit.

Sears argues that it is irrelevant for purposes of the bar doctrines that only a meager quantity of evidence on the issue of violations at other Sears facilities was presented in the Iowa litigation. *See Continental Can Co. v. Marshall*, 603 F.2d 590, 596 (7th Cir. 1979) (substantial imbalance in the quantity of evidence introduced does not avoid preclusive effect). We agree with this as an abstract proposition, but it is not on point here. The specific reason the government should not be barred from presenting evidence in this suit is that it did not attempt to establish nationwide violations during the Iowa liability trial and was *not* aware that it was expected to do so.

In *Montana v. United States, supra,*[64] the Supreme Court indicated that certain "special circumstances" could "warrant an exception to the normal rules of preclusion." 440 U.S. at 155, 99 S.Ct. at 975. Included among such circumstances is the "alleged unfairness or inadequacy" of the litigation procedures in the initial forum. *Id.* at 163, 99 S.Ct. at 979. Specifically,

> [r]edetermination of issues is warranted if there is *reason to doubt* the quality, extensiveness, or fairness of procedures in prior litigation.

*Id.*, at 164 n.11, 99 S.Ct. at 979 (emphasis added). We find this reasoning applicable here to avoid a harsh result.

**64.** We also mention in passing that significant changes in Sears equal pay practices subsequent to the 1976 Iowa adjudication could render collateral estoppel and res judicata principles inapplicable. *See Montana v. United States*, 440 U.S. 147, 155, 99 S.Ct. 970, 974, 59

The comments of Judge Hanson further reveal that he did not intend his *Brennan* and *Usery* decisions to absolutely bar any future monetary and injunctive equal pay claims against Sears anywhere in the country under either the FLSA or Title VII. *Cf. Norfolk & Western Ry. Co. v. Board of Education of the City of Chicago,* 114 F.2d 859, 861 (7th Cir. 1940) (court's remarks must be read in light of what it intended to decide). For example, Judge Hanson noted after trial,

> The complaint in this cause of action alleges Equal Pay Act violations in the defendant's Fort Dodge store, which is only one of defendant's 900 retail establishments across the country. This in itself is not surprising, since the complaint was filed prior to implementation of the Sears' nationwide Plan, and the company's pre–Plan payment schemes were localized in terms of its various retail outlets.

410 F.Supp. at 101.

Tracking this last statement is the following explanation by Judge Hanson of his *Usery* holding:

> The Court in its ruling today is not implying that nationwide injunctions are unjustified unless violations are proven in each unit of a corporate retail chain's stores. The plaintiff's nationwide remedy arguments place strong reliance on *Brennan v. J. M. Fields*, 488 F.2d 443 (5th Cir. 1973), *cert. denied*, 419 U.S. 881 [95 S.Ct. 146, 42 L.Ed.2d 121]. . . . *Fields* is clearly distinguishable from this case, however. First, it was an Equal Pay Act suit in which violations at three stores out of the defendant's sixty were proven at trial, *Id.* at 444; *here, of course, one store out of nine hundred was at issue*. Further, the *Fields* case involved existing violations at those three stores; the record here shows no present violations. . . .

L.Ed.2d 210 (1979) ("controlling facts or legal principles have changed significantly since the [earlier] judgment"). The meager presentation by the Commission on this point, however, does not justify an alternative holding on this basis. *See also* note 63, *supra.* .

The situation *currently* before this Court is far different from *Fields*, . . . .

421 F.Supp. at 414 n.2 (emphasis added). And finally,

The scope of the instant case as framed by the pleadings is the compensation practices relating to division managers and sales persons at the defendant's Fort Dodge, Iowa store.

421 F.Supp. at 415.

A concluding comment is appropriate. Even if we were to apply the bar doctrines here, it is likely that the Iowa adjudication would prevent only the litigation of equal pay claims against division managers and sales persons at Sears facilities. As indicated above, these were the only personnel involved in the *Brennan* and *Usery* litigation. If these positions are regulated locally and are not a part of a nationwide employment plan, it is doubtful that even the assertion of the equal pay claims for these employees would be barred.

We will not apply the res judicata and collateral estoppel doctrines to bar the litigation of equal pay claims in the present Commission action.[65]

*Conclusion*

The Fourth Circuit Court of Appeals has declared that the EEOC's processing of a Title VII charge is "merely preparatory to further proceedings:"

No . . . finality exists with respect to the EEOC's determination of reasonable cause. Standing alone, it is lifeless, and can fix no obligation nor impose any liability on the [respondent]. It is merely preparatory to further proceedings. If and when the EEOC or the charging party files suit in district court, the issue of discrimination will come to life, and the [respondent] will have the opportunity to refute the charges.

*Georator Corp. v. EEOC*, 592 F.2d 765, 768 (4th Cir. 1979).

Similarly, the Supreme Court in *Alexander v. Gardner-Denver Company*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), made the following pronouncement on the adjudication of Title VII claims:

But courts should ever be mindful that Congress in enacting Title VII, thought it necessary to provide a judicial forum for the ultimate resolution of discriminatory claims. It is the duty of the courts to assure the full availability of this forum.

415 U.S. at 60 n.21, 94 S.Ct. at 1025 n.21.

We are mindful of this responsibility and, for the foregoing reasons, will deny the defendant's motion to dismiss.[66] This decision is rendered with some misgivings as to its possible effect on the future attitude of the Commission and its employees. As already indicated, we do not condone the conduct of the Commission and certain of its personnel in this investigation. We do not wish to encourage similar improprieties in the future by creating the impression that *de novo* review will always render the conduct "harmless." We recognize that the

---

**65.** We find it inappropriate to comment, in the context of this motion to dismiss, on the *Commission's* apparent invocation of the collateral estoppel doctrine based on the *Brennan* and *Usery* decisions. *See e. g.*, Plaintiff's Memorandum Regarding Res Judicata and Collateral Estoppel, February 21, 1980, pp. 7–8 ("Any holding in *Usery* that certain jobs are substantially equal would be binding on the basis of collateral estoppel for all situations in which the facts are identical to those reviewed at the Fort Dodge store.").

**66.** Sears at the eleventh hour has filed an amended motion to dismiss, largely repeating its earlier allegations and stating a new civil combination or conspiracy count, apparently under Illinois law. We will grant defendant leave to file the amendment, but the motion is denied on the merits. First, we note that this count is properly characterized as a counterclaim, although it has not been so pleaded. Second, the factual elements of this claim, as set out in the amended motion, mirror the earlier allegations of "capture" of the Commission by the private interests of NOW. We have already broadly construed these allegations and rejected them as a basis for dismissal of this suit. In particular, we note that an employer may not file a "counterclaim or defend [a Title VII suit] based on tort claims." *EEOC v. First National Bank of Jackson*, 614 F.2d 1004, 1006 (5th Cir. 1980) (malicious prosecution and harassment). *See* pp. 251–252 and note 4 *supra*. There is little question that defendant's civil conspiracy claim sounds in tort. Prosser, *Law of Torts*, § 46, at p. 293 (4th ed. 1971).

regulations governing administrative personnel, such as Copus, have been amended and now require advance approval of outside employment and activity. *See* note 14 *supra.* The important question remaining is what kind of activity will be approved in the future. A diminution in the Commission's tolerance for improper appearance is the obvious key to reform.

The court believes that a discovery conference pursuant to Rule 26(f) would be useful. The parties are requested to confer with each other during the next 30 days with a view toward reaching an agreed plan of discovery pertaining to the merits of the Title VII and FLSA claims. A discovery conference, for the purpose of entering an appropriate order, will be scheduled for a date shortly thereafter.

## ON MOTION FOR RECONSIDERATION

Defendant has filed a motion for reconsideration of our decision of November 7, 1980, denying its motion to dismiss. It has raised two arguments in support of its motion: (1) Based on newly discovered "evidence" (Defendant's Memorandum in Support of its Motion for Reconsideration, p. 2), William Brown was no longer a *de jure* Commissioner on August 30, 1973, the date he signed the charge against Sears. His official term of office allegedly expired on August 29, 1973; (2) the decision of the Fifth Circuit Court of Appeals in *Truvillion v. King's Daughters Hospital,* 614 F.2d 520 (5th Cir. 1980), provides "a clear legal basis for dismissal of this action on issues collateral to the merits." Defendant's Motion for Reconsideration, p. 1. We will deny the motion.

### Brown's Term of Office

Prior to this motion for reconsideration, the parties were in agreement that Brown's regular term of office expired on July 1, 1973, with his 60–day holdover period extending his service as EEOC Commissioner through August 30, 1973. *See* Memorandum Opinion of November 7, 1980, at pp. 20–22. Sears now argues that the literal

wording of Brown's appointment–"for the term expiring July 1, 1973" [1]–indicates that the last day of his regular term of office was June 30, 1973. Applying this reasoning, Brown's 60–day holdover period continued only through the close of business on August 29, 1973. To support this interpretation, Sears presents evidence that a different court passing on a different claim involving a different Commissioner so construed the term of office for EEOC Commissioners. *See Lewis v. Carter,* 436 F.Supp. 958, 962 n.6 (D.D.C.1977). Neither party disputes the fact that Brown signed the unverified charge against Sears on August 30, 1973.

■■■ First, we observe that the plain meaning of the phrase "expiring July 1, 1973" indicates that Brown's regular term of office extended to and included that date. "Expiration" means "coming to an end, termination, close . . . ." *Perruccio v. Allen,* 156 Conn. 282, 240 A.2d 912, 914 (1968); "coming to a close," *Clevenger v. Kern,* 100 Ind.App. 581, 197 N.E. 731, 737 (1935); "cessation, close, end, conclusion, or termination . . . ." *Southern Bell Telephone and Telegraph Co. v. Department of Industrial Relations,* 42 Ala.App. 351, 165 So.2d 128, 132 (1964); *generally,* 15A *Words and Phrases,* p. 473. The untenable position of the defendant is illustrated by the use of the words "end" or "ending" (or their synonym "expiring") in two definitions of the word "year:" "[A] period . . . beginning Jan. 1 and *ending* Dec. 31." Random House Dictionary of the English Language (1970), p. 1654; "a cycle in the Gregorian calendar of 365 or 366 days divided into 12 months beginning with January and *ending* with December." Webster's Third New International Dictionary (1971), p. 2648. It would make no sense to contend that "ending Dec. 31" or "ending with December" means that December 30 is the last day of the year of November the last month. Compare Plaintiff's Memorandum in Opposition, p. 4.

■■■ Second, Rule 6(a) of the Federal Rules of Civil Procedure provides that in

1. 115 Cong.Rec. 6436 (March 13, 1969).

computing "any period of time" prescribed by "any applicable statute,"

> the day of the act, event, default from which the designated period of time begins to run shall not be included.

Fed.R.Civ.P. 6(a). Unquestionably, the day of the "act, event" in the instant case--the termination of Brown's regular term of office--was July 1, 1973, which day cannot be included in computing the 60–day holdover period. Nor is Rule 6(a)'s "any applicable statute" language to be read to encompass only statutes of limitation or other filing periods. 4 Wright and Miller, *Federal Practice and Procedure* § 1162, p. 607 n.22. "Its reference ... is broad and can, therefore, reasonably be said to refer to time periods in any statute that will be applied in an action in the District Court." *Pennsylvania Public Utility Commission v. United States,* 311 F.Supp. 1024, 1028 (M.D.Pa.1970) (computation of 30–day notice period set forth in Interstate Commerce Act for proposed discontinuance of railway service).

■■■ Third, the "expiring" language of Brown's appointment must be read in light of the Equal Employment Opportunity Commission's enabling legislation. Enacted on July 2, 1964, Section 705(a) of Title VII, 78 Stat. 258, provides:

> There is hereby created a Commission to be known as the Equal Employment Opportunity Commission, which shall be composed of five members, not more than three of whom shall be members of the same political party, who shall be appointed by the President by and with the consent of the Senate. One of the original members shall be appointed for a term of one year, one for a term of two years, one for a term of three years, one for a term of four years, and one for a *term of five years, beginning from the date of enactment of this title,* but their successors shall be appointed for terms of five years each, except that any individual chosen to fill a vacancy shall be appointed only for the unexpired term of the member whom he shall succeed....

(Emphasis added). We agree with the plaintiff that the last day of a five–year term "which begins July 2 must be July 1."[2] Plaintiff's Memorandum in Opposition, p. 2.

Finally, Judge Parker's conclusion in *Lewis v. Carter, supra,* on the term of office for EEOC Commissioners was not a square holding on the point which is before us.

> The parties appear somewhat confused[3] about when plaintiff's [EEOC Commissioner Colston Lewis'] extended term expires. Defendants assert that the latest date plaintiff can possibly serve is August 29, 1977, sixty days after the end of his original term.... Since no one has been nominated to succeed plaintiff, the August 29, 1977, date *appears* correct.

436 F.Supp. at 962 n.6 (emphasis added). This statement in *Lewis* remains dictum, uncontested by any of the parties to the litigation.

We conclude, then, that Brown's original term of office expired on July 1, 1973, and his holdover term extended through August

---

**2.** The 1964 Equal Employment Opportunity Commission legislation, Section 705(a) of Title VII of the Civil Rights Act, was amended in 1972. The amendments did not affect the period of service of EEOC Commissioners. Sears concedes, in fact, that the congressional resolutions appointing Commissioners after William Brown also include the language "for the term expiring July 1 ...." *See* Defendant's Memorandum in Support of its Motion for Reconsideration, p. 5, n.1.

It is to be noted that Brown was not actually appointed and confirmed as EEOC Commissioner on July 2, 1968, but some eight months later. *See* 115 Cong.Rec. 6436 (March 13, 1969). Nonetheless, Brown's regular term of office expired on July 1, 1973.

**3.** Substantial confusion has also occurred with respect to Commissioner Brown's period of service. In part, this is due to misinformation about the actual commencement date of Brown's term. *See* note 2 *supra.* For example, Judge Varner stated in *EEOC v. Sears, Roebuck and Company,* 490 F.Supp. 1245, 1248 (M.D.Ala.1980):

> The parties seem to agree that Commissioner Brown's five–year term with the EEOC officially expired July 1, 1973. (It would appear that it may have expired on June 30, 1973, *as it apparently began July 1, 1968* ).

(emphasis added).

30, 1973, the date he signed the charge against Sears.

*Truvillion v. King's Daughter Hospital Decision*

The Fifth Circuit Court of Appeals decision in *Truvillion v. King's Daughters Hospital*, 614 F.2d 520 (5th Cir. 1980), does not support Sears' position or justify the reconsideration of our earlier opinion. The actual holding in *Truvillion* was that the dismissal of a Commission case because of its failure to investigate a charging party's job qualifications did not go to the merits and did not bar, under principles of res judicata, a suit by the individual charging party. 614 F.2d at 525. "[A]t no point" in its earlier investigation in *Truvillion* did the EEOC consider the charging party's lack of qualifications for the position of laboratory technician, even though the respondent hospital "raised this issue at every stage of the [EEOC] proceedings." 614 F.2d at 522, 524. The language in the *Truvillion* opinion relied upon by Sears to support the existence of a "clear legal basis for dismissal of this action on issues collateral to the merits" (Motion for Reconsideration, p. 1) is as follows:

> An essential element [of the EEOC's processing of a charge and "as a condition to filing suit"] is a good faith investigation of the charging party's qualification . . . . *See EEOC v. Container Corp. of America*, M.D.Fla.1972, 352 F.Supp. 262, 265. The Commission's failure to meet this condition mandated dismissal of the complaint.

614 F.2d at 525. The case cited by Judge Wisdom in this passage involved the dismissal of a Title VII suit brought by the Commission because of "no [EEOC] investigation whatever" of the 1971 discrimination charges against the union. *EEOC v. Container Corp. of America, supra*, 352 F.Supp. at 265. In summary, all the court addressed in *Truvillion* was the requirement that the Commission investigate in good faith the elements of a charge (including the charging party's job qualifications).

The opinion never discussed the distinct question presented by the instant case, whether the Commission conducted and generally proceeded with its investigation in good faith, free from governmental "misconduct." Defendant's Memorandum in Support of its Motion for Reconsideration, p. 11.[4]

Defendant's motion for reconsideration is denied.

---

**4.** We have previously held that the Commission has satisfied its "conditions precedent to suit," Opinion of November 7, 1980, pp. 15–28, and have fully discussed the agency's "improprieties and abusive practices." Opinion of November 7, 1980, pp. 28–39.